[Cite as *State v. Topping*, 2012-Ohio-5617.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

STATE OF OHIO,                           :

    Plaintiff-Appellee,              :      Case No.   11CA6

    vs.                              :

FLINT E. TOPPING,                        :      DECISION AND JUDGMENT ENTRY


    Defendant-Appellant.             :

_____

APPEARANCES:

COUNSEL FOR APPELLANT:       Timothy Young, Ohio State Public Defender, and Stephen A.
Goldmeier, Ohio State Assistant Public Defender, 250 East
Broad Street, Suite 1400, Columbus, Ohio 43215

COUNSEL FOR APPELLEE:        J.B. Collier, Jr., Lawrence County Prosecuting Attorney, and
Robert C. Anderson, Lawrence County Assistant Prosecuting
Attorney, Lawrence County Court House, One Veteran's
Square, Ironton, Ohio 45638

CRIMINAL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 11-19-12
ABELE, P.J.

{¶ 1}   This is an appeal from a Lawrence County Common Pleas Court judgment of

conviction and sentence.   A jury found Flint Topping, defendant below and appellant herein, guilty

of (1) felonious assault in violation of R.C. 2903.11(A)(1), and (2) kidnapping in violation of R.C.

2905.01(A)(3).   The trial court sentenced appellant to serve concurrent prison terms of eight years

for the felonious assault conviction and ten years for the kidnapping conviction.

{¶ 2}   Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE COURT ERRED IN ALLOWING THE STATE TO ADMIT

MR. TOPPING'S PREVIOUS CONVICTION FOR RAPE OR ANY

DETAILS OF THAT CONVICTION UNDER EVIDENCE RULE

609, BECAUSE THE EVIDENCE'S PROBATIVE VALUE WAS

OUTWEIGHED BY ITS PREJUDICIAL EFFECT, IN VIOLATION

OF MR. TOPPING'S DUE PROCESS RIGHTS."

SECOND ASSIGNMENT OF ERROR:

"THE CONVICTIONS OF MR. TOPPING FOR KIDNAPPING AND
FELONIOUS ASSAULT, COUNTS ONE AND TWO, ARE
AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND
ARE BASED ON INSUFFICIENT EVIDENCE, IN VIOLATION OF
THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I
OF THE OHIO CONSTITUTION."

THIRD ASSIGNMENT OF ERROR:

"MR. TOPPING WAS DENIED THE RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL DID
NOT OBJECT TO THE PROSECUTION'S MISCONDUCT
DURING CLOSING ARGUMENT, WHICH VIOLATED MR.
TOPPING'S RIGHT TO DUE PROCESS AND TO EFFECTIVE
ASSISTANCE OF COUNSEL."

{¶ 3}   On the morning of December 11, 2011, Tom Snyder encountered appellant's stalled white truck along Big Branch Road.   He asked appellant if he needed assistance and while doing so, he noticed a woman holding a child.   The woman had swollen eyes and silently indicated to Snyder that she needed help.   Snyder gathered that the woman was in distress and called 911.

{¶ 4}   Lawrence County Sheriff's Deputy Darren Hamilin responded to the 911 dispatch.

He photographed the female occupant, Patricia Cogan.   Deputy Hamilin's photographs reveal that Cogan sustained several injuries: (1) a swollen left eye; (2) a damaged lip; (3) a red face; (4) scraping and abrasions on her right hand; (5) bruises on her legs; and (6) a snowball-size chunk of her hair removed from her head.   Throughout the encounter with Deputy Hamilin, Cogan continually repeated to the deputy that "[appellant] was going to kill me thank God you saved my life [sic]."   Deputy Hamilin subsequently arrested appellant.   On February 7, 2011, a Lawrence County Grand Jury returned an indictment that charged appellant with felonious assault and kidnapping.

{¶ 5}   At trial, the parties presented conflicting evidence.   The state's primary witness, Cogan, stated that appellant removed her from a party, forced her into his truck, and drove around throughout the night and into the morning.   She testified that appellant stopped the truck several times, dragged her from the car, and beat her.   Cogan more particularly explained that on December 10, 2010, she had agreed to accompany appellant to Vanessa Dixon's birthday party. Cogan stated that she told appellant that after the party, she wanted to go to her sister's house, which was about a five-minute walk from Dixon's house.   Cogan stated that she consumed alcoholic beverages at the party and that later in the evening, she fell and hit the floor.   Cogan testified that she put her hands down to break her fall and stated that she did not hit her head when she fell.   Cogan explained that she eventually fell asleep with her approximately two-year old son.  She testified that she awoke to appellant slapping her in the face.   She got out of bed and sat in Dixon's living room and heard appellant and Dixon arguing.   She asked another party-goer, apparently Dixon's boyfriend, if he would walk her to her sister's house.   Dixon called Cogan "a bitch and she said my boyfriend is not going anywhere with you."   Cogan stated that Dixon "just

wanted us out of there." She explained that she, her child, appellant, and Dixon continued the argument outside and Dixon put her child in the car seat that was inside appellant's truck. As Cogan climbed in the truck, appellant grabbed her by her hair and yanked her out of the truck. Dixon and appellant continued arguing, so Cogan removed her child from the car seat and intended to walk to her sister's house. Appellant yelled at her to get back in the truck and Dixon took the child and put him back in the car seat. Cogan told appellant that she was not going to get in the truck and that she was going to go to her sister's house. Dixon told Cogan that appellant would take her to her sister's house, but Cogan stated that she would not return to the truck. Cogan testified that appellant and Dixon eventually pushed her in the truck.

{¶ 6} Cogan explained that appellant drove the truck towards her sister's house, but turned around and did not take her there. She then realized that her wallet and pocket knife were missing. She told appellant "to turn around because his friends stole [her] wallet." Cogan stated that appellant stopped the truck and then hit her four or five times. Appellant started driving again, but a short time later, he stopped the vehicle, dragged Cogan out of the truck by her hair, and hit her in the face. When he finished hitting her, he pushed her back into the truck. They continued driving and appellant stopped the vehicle another three or four times and again hit Cogan each time. Throughout the encounter, appellant "kept telling [Cogan] that he was going to kill [her]." At one point, Cogan hit appellant in the head with a full can of beer. Appellant removed the beer can from her hand and hit her with it until she was unconscious. When she awoke, she discovered that they were parked at a Lowe's store parking lot. Appellant was still sleeping and she woke him to request that he start the car to warm it up inside. Cogan stated that she did not consider trying to sneak out of the truck and escape because she was afraid. She

testified that she "was scared to death, and * * * [appellant] kept telling [her] throughout the night he was going to kill me, he's going to kill me, he's going to kill me, he's going to kill me, it was on and on."

{¶ 7} They subsequently left the Lowe's parking lot and drove to a secluded house, which Cogan learned belonged to appellant's mother.   Cogan stated that appellant told her that "if [she] tried to make a run for it that he would run [her] down."

{¶ 8} Shortly after leaving his mother's house, appellant's truck stalled.   Cogan stated that two people approached the car and she "was like mouthing to them to call 911."   Once Deputy Hamilin arrived, she was still so "scared to death [that she] couldn't even talk."   She "was just mouthing to him to please help [her]."

{¶ 9} Appellant's defense theory was that Cogan's injuries resulted when she became so drunk at Dixon's party that she fell face forward into the floor, into an end table, into a coffee table, and into an exercise machine.   Dixon, appellant's life-long friend and former romantic partner, testified that Cogan "was completely out of her mind.   She was falling everywhere [and] staggering."   Dixon stated that another party-goer helped Cogan sit on a love seat, but Cogan stood up and fell "face first" into the hardwood floor.   Dixon testified that Cogan "was falling and staggering" and that she fell into a coffee table and an end table.   Dixon also stated that Cogan had "[q]uite a few" encounters with an exercise machine.   Dixon explained that she and her boyfriend took Cogan to a bedroom and Dixon encouraged her to sleep.   Dixon stated that after she placed Cogan on the bed, Cogan "stood up and fell backwards over" the exercise machine.   Dixon further explained Cogan's fall into the exercise machine as follows: "I don't [know] if you've seen [a Bow Flex] or not but the arms are like this and they are metal she hit face first on that and just dropped.

[sic]" Dixon stated that she again placed Cogan in bed and after she left the room, Dixon heard Dixon's grandmother yelling for help. Dixon testified that Cogan was laying on the floor in the hallway. She stated that she then told appellant that he needed to take Cogan out of her house.

{¶ 10} Dixon explained that Cogan picked up her son and fell "with him and busts his head off of the floor." Dixon stated that Dixon's seventeen-year old daughter, Rebecca, assisted Cogan with the child.

{¶ 11} Dixon continued to tell appellant that he needed to take Cogan home. Appellant stated that he would, but Cogan stated that she wanted to go to her sister's house. Dixon explained: "She's like take me to my sisters [sic], take me to my sisters [sic], she's like and your [sic] going to take me. I'm like I'm not taking you no where [sic]." Dixon told Cogan, "you came with [appellant] you are leaving with him [sic]. [Cogan]'s like well just fine, fine, fine. Just give me my kid, give me my kid." Dixon stated that Cogan "grab[bed]" the child and placed him in the car seat in appellant's truck.

{¶ 12} Dixon explained that appellant exited the house and Dixon told appellant: "let me just take her up there, he's like go ahead and drive and I'm like, no, no, no, wait it's my dad's truck, it's my dad's truck, it's my dad's truck. It ain't got insurance on it, it won't cover you I will just go ahead and take her. [sic]" Dixon stated that appellant entered the truck and Cogan "starts just way laying [sic] him. I mean beating him like she's in the back. He's trying to get in the front to drive and she's just beating on him. He's like no I'm not doing this, I'm not doing this. So he gets out of the truck and he says get out of my truck, get out of my truck." Dixon explained that Cogan would not exit the truck, so appellant "reaches over" and "grabs her by the hair of the head to go to pull her out," but she still did not exit the truck. Dixon stated that Cogan did not tell

appellant to take her to her sister's house, but she told Dixon.   Dixon testified that appellant left with Cogan and "just drove off" because "he had no[] other choice."   Dixon stated that before Cogan left the party, Cogan's nose already was swollen, her eyes had started to turn purple, and her lip was busted.   She testified that appellant did not pull Cogan "out of the truck backwards on to the ground."   Dixon also stated that appellant did not cause any of Cogan's injuries.

{¶ 13}   On cross-examination, Dixon stated that although she has known appellant all of her life and once had a romantic relationship with him, she would not lie for him.   Dixon testified that even though appellant pulled Cogan by her hair, he did not "pull it hard enough at that time to pull it out."   She also stated that appellant did not pull Cogan from the truck.   The prosecutor presented Dixon with a written statement that she gave to law enforcement officers shortly after the incident in which she stated that "when he pulled [Cogan] out he pulled her by her hair out of the truck."   At trial, however, Dixon stated that "[a]s far as [she] remember[s appellant] didn't pull her out."   Dixon further admitted, however, that she "could be wrong."   The prosecutor further pressed Dixon to explain her inability to state whether appellant pulled Cogan from the truck, and Dixon stated that she "could have been wrong now or [when she gave the statement]."   She agreed with the prosecutor that her memory probably was better shortly after the incident than it was at trial.   The prosecutor then asked her if "it would be fair to say it is more likely that, that statement [is] correct, that he did grab her by the hair and he pulled her out of the truck."   Dixon responded, "Yes."

{¶ 14}   Rebecca Dixon, Vanessa's daughter, likewise stated that Cogan was drunk and falling.   Rebecca testified that Cogan "started acting very drunk and she started falling over stuff like the couch and the table and she was sitting on the couch[;] she leaned up and when she did she

fell face first onto the floor and bust her nose. Then she went to pick up her child cause he was going mom, mom, mom. When she did she fell with the child and he hit his head off of the floor the same time she did. Then she turned around after I took the child away from her and she um, hit her face off of the coffee table. She could barely stand." Rebecca further stated that Cogan fell into an exercise machine "[a]bout three" times. Rebecca explained that after her mother told Cogan she had to leave, Cogan entered appellant's truck then attempted to exit, but she fell out of the truck. Rebecca stated that she and her mother helped Cogan re-enter the truck and she left with appellant. Rebecca testified that she did not see appellant hit Cogan.

{¶ 15} On cross-examination, the prosecutor questioned Rebecca as to the manner in which Cogan fell. Rebecca agreed with the prosecutor's description that Cogan falling was "just like a tree falling," meaning that Cogan did not have any balance and could not control her arms to prevent her fall. Rebecca also agreed that a person's instinct when falling would be to put one's arms out to break the fall, rather than falling face first. Rebecca explained, however, that Cogan apparently was so drunk she was unable to break her fall with her arms.

{¶ 16} Rebecca testified that she was outside with Cogan, Dixon, and appellant when Cogan and appellant were leaving. She stated that appellant did not hit Cogan but "stood by the driver's side door." Rebecca testified that she was unaware that her mother stated that appellant pulled Cogan's hair. She explained that she must have missed that incident because she had to take Cogan's child inside the house. The prosecutor asked Rebecca whether she thought "that [it] was important to tell us earlier that [she] w[as]n't out there the whole time." Rebecca stated, "Yes."

{¶ 17} The prosecutor asked Rebecca why the child was not in the car seat, as Dixon's

mother had stated.   Rebecca explained that the child had been in the car seat, but "we had to take him back in because [Cogan] was trying to get out of the truck[;] that's when she fell."   The prosecutor asked Rebecca to explain why her mother testified at trial that appellant pulled Cogan by her hair, but did not pull her out of the truck, yet in her written statement to law enforcement shortly after the incident stated that appellant did pull Cogan out of the truck.   Rebecca stated that she did not "understand why she would put that in there because [Cogan] was trying to get out and when she did, she fell over the seat belt and I thought she fell out of the truck cause she was in the back."

{¶ 18}   Rosa Britt, appellant's mother, testified that appellant stopped by her house before 8:00 a.m. on December 11, 2010.   She stated that "as soon as [appellant] walked through the kitchen door [she] said who've you been into a fight with?"   Britt explained that appellant "had blood trickling down the side of his face," so she "assumed he had probably been in a fight." Appellant told him that he had been in a fight with "some bitch."   After further discussion, appellant told her that "some girl hit [him] in the head with a full beer."   Britt stated that she observed "a big knot" and a cut on the left side of appellant's face.   She explained that appellant appeared calm, but maybe "a little hung over and tired."

{¶ 19}   Britt stated that when appellant entered the house, he left his truck running with the keys in the ignition.   She testified that he remained at her house for approximately twenty minutes.  When she walked outside with him, he asked her for money because he needed to buy gas to get home.   She then observed Cogan in the truck, sitting in the front driver's seat.   Cogan yelled "hey" at appellant and appellant told her to "shut up a minute[;] I am trying to talk to my mother."   As Britt said goodbye to appellant, Cogan yelled, "let's go, let's go."   Britt stated that Cogan

appeared "out of it" and drunk or "on drugs or something."

{¶ 20} On cross-examination, the prosecutor asked Britt why her first assumption when she noticed blood on her son was that he had been in a fight, rather than he had been injured by accident. She stated, "Well I just kind of assumed that it might have been a fight. Because of the way the blood was trickling down his face." She stated that she did not assume he accidentally injured himself because if he had, she believes "he would have said something about it as soon as he come [sic] through the door[;] he would have said look what I just did, knocked myself in the head or whatever or can I have paper towel and some water to wash my face off or whatever." The prosecutor asked Britt whether she was surprised that appellant stated he had been in a fight. She stated "no * * * [b]ecause he has been in fights before."

{¶ 21} The prosecutor questioned Britt about the knot she observed on appellant's head. She stated that it was on his forehead and was easily visible. The prosecutor then presented her with appellant's booking photograph that was taken about an hour or two later and asked her to point to the knot on his head. Britt stated that it was not visible in the photograph because it was behind "hairs [sic] hanging down."

{¶ 22} The prosecutor asked Britt how many beers appellant would need to consume to be "hung over." Britt stated that she did not know but that "[i]t doesn't take very much for him any more." She did not believe that it would have taken more than three or four. The prosecutor questioned Britt whether she loved appellant "like a mother." She stated yes but further stated that she would not lie for him. He asked her whether she loves appellant "no matter what he does," and she stated, "No I don't love him no matter what he does." The prosecutor then asked her whether she "quit loving him because he does certain thing," to which Britt responded, "You know

what I mean."

{¶ 23}  Appellant testified he was with Cogan on December 10, 2011 at the tattoo shop he was getting ready to open.   He stated that while there, Cogan crushed a "zanny" and snorted it through a tube.   Appellant explained that Cogan agreed to stop by Dixon's birthday party.   He stated that he did not plan to take Cogan to her sister's house and that Cogan did not plan and did not want to go to her sister's house.   Appellant stated that Cogan did not want to go to her sister's house because Cogan does not have a good relationship with one of the individuals currently living with her sister.

{¶ 24}  After they had been at Dixon's party for a while, Dixon "came running into the kitchen and she told [appellant] she said you need to get [Cogan] out of here."   Appellant asked Dixon what had happened, and Dixon told him that Cogan "is falling every where."   Appellant went to the bedroom and saw Cogan fall into an exercise machine.   Appellant explained that Cogan may have believed that he hit her because after she fell into the exercise machine, appellant "ran to her" and "picked her up."   He stated that "[w]hen she opened her eyes [he] was the first person she seen[;] [sic] I was picking her up and she said get your fucking hands off me."   Cogan asked him why he had hit her.   Appellant informed her that no one had hit her.

{¶ 25}  Appellant stated that he said goodbye to his friends and then went outside, by which point Dixon had placed Cogan's child in the truck and Cogan was sitting in the truck.   Appellant overheard Cogan and Dixon talking and he stated that Cogan asked Dixon why appellant had hit her and claimed that someone had stolen her money.

{¶ 26}  When appellant arrived at the truck, Cogan began arguing with him and asking him

why he hit her and who had stolen her money.   Appellant told her that no one had hit her.   He told Cogan to return to the truck.   Appellant testified that Cogan "started swinging at me" and "screaming at me[,] why did you hit me."   Appellant explained that he tried to calm down Cogan and told her to "chill out."   He stated that Cogan's behavior was erratic, "like one minute she would calm down and the next minute she'd be going off again."   Appellant decided to tell Cogan to get out of his truck if she believed that he had hit her or that he or someone else had stolen her money.   He stated that he would not "want to take her home" when she was "acting crazy and thinking that I hit her."   Appellant testified that Cogan continued "ranting and raving," so he grabbed her, pulled her out of the truck, and told her to get out of the truck.   Appellant believes he may have unintentionally pulled Cogan by the hair.   Appellant stated that he did not hit her and "never laid a hand on her."

{¶ 27}  Appellant stated that Dixon tried to calm down Cogan and that Cogan climbed back in the truck, at which point she started to relax.   Appellant testified that once he entered the truck, Cogan pushed his seat forward and tried to crawl out but her foot became stuck in the seat belt and she fell out of the truck.   Once Cogan re-entered the truck, he left and intended to drive her home. While driving, Cogan again yelled at appellant about hitting her and about someone stealing her money.   Appellant testified that as Cogan continued yelling at him, she grabbed a full can of beer and hit him on the side of the head.   He stated that the beer can exploded, spilling beer all over appellant and the truck.   Appellant testified that Cogan then "comes up over the seat attacking [him]," which made it difficult for appellant to retain control of the truck.   Appellant stopped the truck because Cogan was attacking him.   He exited the truck and asked Cogan "what the hell's wrong with you?   You know are you trying to get us killed.   You know there is a two year old

baby in the truck and she just w[h]acks me in the back of the head with a beer." Appellant stated that Cogan continued yelling at him while she attempted to exit the truck, but she fell out of the truck and onto the gravel. He testified that he picked her up, but Cogan continued to be "irrate." Appellant stated that Cogan started to remove the child from the car seat, but he prevented her from doing so because she was "not in any shape to be carrying this baby." Appellant explained that Cogan told him to give her the child but appellant refused. He told Cogan that she was "messed up" and could not "even walk." Appellant claimed that Cogan "pulled out a knife" and attempted to open it, but he took it from her. Appellant stated that he tried to calm her down and "actually * * * hugged her." He stated that Cogan "started chilling out" and climbed back in the truck, but as she did so, she grabbed a coffee cup and hit him on the left side of the head. Appellant testified that she hit him so hard that it "knocked [him] out." He stated that when he awoke, Cogan was "over top of [him]" and stated that she was sorry. They both returned to the truck and at some point, appellant felt like he was "getting sick to [his] stomach." Appellant stopped the truck and waited until he felt better. He stated that when he returned to the truck, he could hear Cogan snoring. He testified that he continued to sit for a while because he still did not feel quite well. He eventually "realized" that he "need[ed] to talk to somebody[;] get you know, get in touch with someone and let them know what's going on." Appellant explained that he decided to go to his mother's house so that he could explain the events to her. As he drove towards his mother's house, he believed he "possibly dozed off," so he decided to stop at a Lowe's parking lot to sleep. Cogan awoke him and asked him to start the truck and turn on the heat. He agreed and told her that he needed to stop by his mother's house.

{¶ 28} Appellant testified that when he arrived at his mother's house, he left Cogan in the

truck with the truck's keys in the ignition.   He went inside and told his mother that he "need[ed] to talk to [her]."   She asked him with whom he had fought.   Appellant explained that he did not "even know how to approach this conversation."   He eventually told her that "this crazy bitch hit [him] with a beer and she hit [him] with a coffee cup."   After approximately twenty minutes, he left with Cogan and her child.   He started driving and wanted to take Cogan back to Dixon's house so that Dixon and the other party-goers could "explain to [Cogan] what had happened the night before and give her the option now that she's more coherent and, and, and more able to care for her child.   To either go to her sisters [sic] or go you know where ever or I would even take her back to Kentucky where I got her."   Appellant explained, however, that he never reached Dixon's house because as he was driving, his truck "just totally lost power."

{¶ 29}   Appellant's counsel showed him the photographs of Cogan's injuries.   Appellant denied hitting her or taking her anywhere against her will.   Appellant stated that he informed Cogan that he was going to his mother's house "[t]o talk to [his] daughter and tell her we wasn't [sic] going shopping. [Cogan] didn't know that I was trying to brief my mom on what happened."   Appellant testified that Cogan stated that it was "okay" to go to his mother's house.

{¶ 30}   On cross-examination, the prosecutor asked appellant whether he was a convicted felon.   Appellant responded "yes."   The prosecutor then stated, "And do you want to tell me about it or you want me to tell you?"   Appellant's counsel objected in a general fashion, and the court overruled his objection.   Appellant responded that he did not care to discuss his "past criminal record" because he did not believe that it "appl[ied] in this case."   The following colloquy ensued:

> "Q.   You, in 2001 you pled guilty of raping a child under thirteen years of age in this court, didn't you?
> A.   I pled Alford plea sir.

Q. Well that's a plea of guilty.   I've got your Judgment Entry here[;] we can look at it together.   But you were found guilty after that plea[,] weren't you?

A. Yes sir.

Q. And it was, the charge was raping a child under thirteen years of age.

A. That's what the charge was yes sir.

Q. And as a result of that guilty plea you served seven years in the penitentiary?

A. Yes sir I did."

a.     The prosecutor next asked appellant whether his conviction required that he register as a sex offender.   Appellant responded affirmatively and then agreed "last year," he entered a guilty plea to "a second degree felony of attempted failure to provide notice of change of address."

**{¶ 31}** Appellant stated that he was not drinking at Dixon's party and that the witnesses who stated he had were incorrect.   He explained that his mother may have thought he was hung over because she smelled the beer that had exploded on him after Cogan hit him with the beer can.

**{¶ 32}** Appellant explained that once Cogan finally fell asleep, he felt his option "was to sit still because * * * I was nauseated and I was dizzy and I felt ill."   The prosecutor asked him why he did not think an option was to take Cogan to the hospital.   Appellant stated that he "was injured as well" and could not drive at the time.   The prosecutor asked appellant why he did not take Cogan to the police station to file a report that she assaulted him.   Appellant stated that he "could have but [he] didn't want her to lose her child."

**{¶ 33}** In attempting to further discredit appellant's testimony, the prosecutor questioned him why he left the truck running for twenty minutes while he visited with his mother if he knew he was about to run out of gas.   Appellant stated, "That's why I needed gas money."

**{¶ 34}** The prosecutor asked appellant if he knew how a large chunk of Cogan's hair fell

out.   Appellant stated that he did not know.   The prosecutor explained that someone obviously removed the chunk of hair before Deputy Hamilin discovered Cogan and that the evidence pointed to appellant.   The prosecutor asked appellant whether he thought Cogan did it to herself. Appellant stated he did not know.   Appellant explained that he did not think the missing chunk of hair was possible.   He stated: "That much hair, jerking that much hair out.   I would think that it would, there would be torn tissue and blood and everything if you tore that much hair out of your head at one time."

{¶ 35} On re-direct, appellant explained that he had heard that as a result of the December 10-11, 2010 incident, Cogan's hair was tangled and matted and that she had to cut some of it.   He thought that perhaps Cogan cut the chunk of hair out or she pulled it out while trying to untangle it. On re-cross examination, the prosecutor questioned appellant how he could believe that if the picture showing the chunk of her hair missing was taken shortly after his arrest on December 11, 2010, before Cogan ever tried to fix her tangled and matted hair.   Appellant stated that he was not certain when the picture showing the missing chunk of hair had been taken.   When the prosecutor advised him that Deputy Hamilin testified that he took the photographs on December 11, 2010, appellant stated that he did not "think anyone really knows when they was [sic] taken."

{¶ 36} The prosecutor further questioned appellant how he believes Cogan may have pulled the hair out when she attempted to comb out the tangles, yet he also testified that he did not believe it was possible to remove that amount of hair by someone pulling on it.   Appellant explained: "Maybe a person could set [sic] and pull it out a little bit at a time.   I don't think, I don't think if you grabbed a handful of hair, it's like a bundle of sticks, you take one stick you can break it real easy.   You take a bundle of sticks you can't break it."

{¶ 37} During closing arguments, the prosecutor suggested that appellant's evidence was "not worthy of belief." The prosecutor pointed out the discrepancies between the defense witnesses' testimony, such as Dixon's testimony that appellant pulled Cogan by the hair and appellant's testimony that he may have accidentally grabbed part of her hair. The prosecutor then argued that Dixon was not "creditable" [sic]. The prosecutor also suggested that Dixon's daughter was not a credible witness because she initially stated that she did not see appellant pull Cogan's hair but then later explained that the reason she did not see it was because she had taken Cogan's child into the house, a fact Dixon had never revealed. The prosecutor further argued that appellant was not a credible witness due to his prior felony conviction. He suggested that someone with a felony record "might be considered less believable than someone like [Cogan] who is 44 years old and never had a record." The prosecutor suggested that the defense witnesses' stories were not credible because they embellished the facts. For instance, they all stated that Cogan fell face first, like a tree. Appellant never admitted that he caused any injuries to Cogan and never stated that perhaps he accidentally injured her. Instead, he stated that he never "la[id] a hand on her that whole time." The prosecutor argued that appellant's testimony was "just preposterous" and "[y]ou would have to be a fool to believe it." The prosecutor stated that he was "on the right side of the case" and that the defense case "is incredible."

{¶ 38} On March 14, 2011, the jury found appellant guilty of felonious assault and kidnapping. On March 21, 2011, the court sentenced appellant. This appeal followed.

I

{¶ 39} In his first assignment of error, appellant asserts that the trial court abused its

discretion by permitting the state to introduce evidence, under Evid.R. 609(A)(2), regarding

appellant's prior rape conviction when the prejudicial effect outweighed the probative value of the

evidence.   He contends that the evidence bore no probative value regarding his credibility because

the conviction occurred ten years ago and did not involve his character for truthfulness.   Appellant

additionally suggests that the evidence was prejudicial because both the prior rape conviction and

the kidnapping charge contain an element of force, which then leads to an impermissible character

inference that because appellant acted with force in regards to the rape conviction, he also must

have acted with force in regards to the kidnapping charge.

{¶ 40}  Appellant further argues that the trial court abused its discretion by allowing the

state to refer to the crime as "raping a child under thirteen years of age."   He contends that

referring to the crime as "raping a child" violated Evid.R. 609 because this reference did more than

name the offense, the date, and the punishment.   Appellant additionally asserts that referring to the

conviction as rape of a child constituted an impermissible character attack instead of a credibility

attack.

A

STANDARD OF REVIEW

{¶ 41}  The admission or exclusion of evidence generally rests within the sound discretion

of the trial court.   E.g., State v. Robb, 88 Ohio St.3d 59, 68, 723 N.E.2d 1019 (2000).   Absent an

abuse of discretion, an appellate court will not disturb a trial court's ruling regarding the

admissibility of evidence.   E.g., State v. Martin, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985).

An abuse of discretion connotes more than an error of law or judgment; it implies that the court's

attitude was unreasonable, arbitrary, or unconscionable.   E.g., State v. Adams, 62 Ohio St.2d 151,

157, 404 N.E.2d 144 (1980).

B

EVID.R. 609

Evid.R. 609 states:

> (A) General rule

> For the purpose of attacking the credibility of a witness:

> * * * *

> (2) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

> * * * *

{¶ 42} Appellant raises two issues under this rule: (1) whether the trial court abused its

discretion by admitting evidence of his prior conviction; and (2) whether the state exceeded the

permissible scope of examination when inquiring into his prior conviction, i.e., whether the rule

permitted the state to refer to the crime as "raping a child under thirteen years of age."

1

Principles Governing Admission of Prior Conviction Evidence

{¶ 43} "When an accused testifies at trial, Evid.R. 609(A)(2) allows the state to impeach

the accused's credibility with evidence that the accused was convicted of an offense punishable by

imprisonment in excess of one year and if the court determines that the probative value of the

evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the

jury."   State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶132; State v.

Dickess, 174 Ohio App.3d 658, 2008-Ohio-39, 884 N.E.2d 92, 102 (4th Dist. 2008), ¶38.   "The

existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to

the jury unless specifically permitted under statute or rule.   The undeniable effect of such

information is to incite the jury to convict based on past misconduct rather than restrict their

attention to the offense at hand."   State v. Allen, 29 Ohio St.3d 53, 55, 506 N.E.2d 199 (1987).

Even when such evidence is properly before the jury, the trial court must consider its prejudicial

effect.   Evid.R. 609(A)(2).   When the prior conviction is for the same crime with which a

defendant is presently charged, the risk of unfair prejudice is greater.   The natural tendency of

prior conviction evidence in this situation is to instill in the minds of the jurors the idea that "'if he

did it before, he probably did it this time.'"   State v. Goney, 87 Ohio App.3d 497, 502, 622 N.E.2d

688 (2nd Dist. 1993), quoting Gordon v. United States, 383 F.2d 936, 940 (C.A.D.C.1967).

Therefore, "'those convictions which are for the same crime should be admitted sparingly.'"   Id.

{¶ 44}  In the case at bar, we do not believe that the trial court abused its discretion by

admitting appellant's prior conviction into evidence.   The trial court could have reasonably

determined that the prior conviction was relevant and probative evidence to impeach appellant's

credibility and that its probative value outweighed its prejudicial effect.

{¶ 45}  While we agree with appellant that the crime of rape generally does not involve

untruthfulness, we do not agree that this fact renders a prior rape conviction inadmissible in a

criminal trial.   Courts routinely allow prior conviction evidence under Evid.R. 609(A)(2) even if

the prior conviction did not contain an element of untruthfulness.   E.g., State v. Brown, 100 Ohio

St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶27 (holding that trial court did not abuse its

discretion by allowing state to impeach aggravated murder defendant's credibility by introducing evidence of prior drug convictions); State v. Benitez, 8th Dist. No. 96257, 2011-Ohio-5498, ¶66 (determining that prosecutor did not engage in misconduct by introducing evidence regarding accused's prior felonious assault conviction); State v. Sailor, 8th Dist. No. 83552, 2004-Ohio-5207, ¶39 (concluding that trial court did not abuse its discretion by permitting evidence of accused's prior drug related convictions in aggravated murder trial).   Moreover, requiring a prior conviction to be specifically probative of truthfulness would defeat the purpose of Evid.R. 609(A)(2) and render Evid.R. 609(A)(3)[1] meaningless.

{¶ 46} Second, we do not agree with appellant that the nearly ten-year time period that elapsed between his prior rape conviction and the current charges renders the prior rape conviction irrelevant or lacking in probative value.   Even though the conviction occurred slightly less than ten years prior to appellant's current charges, it occurred within the Evid.R. 609(B) ten year time limit.   Thus, under the rule, the prior rape conviction is permissible as evidence.   Moreover, in between, appellant had been convicted of failing to register as a sex offender.   Thus, this intervening crime diminishes any alleged prejudicial effect of allowing an almost ten-year old conviction into evidence.

{¶ 47} We further disagree with appellant that evidence of the prior rape conviction unfairly prejudiced him because the crime of rape, like kidnapping, contains an element of force.

---

[1]   Evid.R. 609(A)(3) specifically permits a trial to admit evidence that a witness or an accused has been convicted of a crime involving dishonesty or false statement.     The rule states:

> (3) notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance.

Both offenses, as well as felonious assault, may be generally thought of as offenses of violence, and thus, admitting appellant's rape conviction bears some prejudice. In the case sub judice, however, appellant's R.C. 2907.02(A)(1)(b) rape conviction did not contain force as an element. Instead, R.C. 2907.02(A)(1)(b) only required that appellant engage in sexual conduct with another person who is not his spouse when the other person is under thirteen years of age. We do note, however, that rape typically is perceived as using force or violence for sexual pleasure. Thus, while admitting evidence of his prior rape conviction contained some degree of prejudice, we cannot state that the trial court abused its discretion by determining that the probative value of the evidence outweighed any prejudice that may have resulted due to the common force or violence element among the crimes.

{¶ 48} Additionally, even if the trial court somehow abused its discretion by admitting the evidence, we observe that following the line of questioning regarding appellant's rape conviction, the prosecutor inquired into his more recent conviction for failing to register as a sex offender. Appellant did not object to the prosecutor's use of the term "sex offender" or to this line of questioning. Thus, even without evidence of appellant's prior rape conviction, the jury heard evidence that appellant was a sex offender. The natural inference is that he must have committed a sex crime.

{¶ 49} In consideration of the foregoing factors, we cannot state that the trial court abused its discretion by determining that the probative value of appellant's prior conviction outweighed the prejudicial effect. The court determined that appellant's prior conviction would help the jury to evaluate appellant's credibility, despite any prejudice that resulted to appellant.

2

Scope of Examination

**{¶ 50}** Appellant next asserts that even if the court did not abuse its discretion when it

admitted his prior conviction, the court abused its discretion by permitting the state to refer to the

crime as "raping a child under thirteen years of age."

**{¶ 51}** Under Evid.R. 609(A)(2), a prosecutor can cross-examine as to "'the name of the

crime, the time and place of conviction, and sometimes the punishment.'"   However, "'details

such as the victim's name and the aggravating circumstances'" are not permissible.   1 Giannelli &

Snyder, Evidence (2d Ed.2001) 473, Section 609.15, quoting 1 McCormick on Evidence (5th

Ed.1999) 167, Section 42.   Nevertheless, the trial court "has broad discretion in determining the

extent to which testimony will be admitted under Evid.R. 609."   State v. Wright, 48 Ohio St.3d 5,

548 N.E.2d 923 (1990), syllabus; see, also, State v. Amburgey, 33 Ohio St.3d 115, 117, 515

N.E.2d 925 (1987).

**{¶ 52}** McCormick explains the scope of cross-examination as follows:

> "[The cross-examiner] may ask about the name of the crime committed, i.e.,
> murder or embezzlement.   It will certainly add to the pungency of the impeachment
> where the crime was an aggravated one if he may ask about the circumstances, for
> example, whether the murder victim was a baby, the niece of the witness.   And it
> has been suggested by a few courts that since proof by record is allowable, and the
> record might show some of these circumstances, the cross-examination should at
> least be permitted to touch all the facts that the record would.   On the whole,
> however, the more reasonable practice, minimizing prejudice and distraction from
> the issues, is the generally prevailing one that beyond the name of the crime, the
> time and place of conviction, and sometimes the punishment; further details such as
> the name of the victim and the aggravating circumstances may not be inquired into."

McCormick on Evidence (4th Ed. 1992 Strong) 57, Section 42.

**{¶ 53}** In the case sub judice, appellant's prior judgment entry of conviction states that he

was convicted of rape under R.C. 2907.02(A)(1)(b), which prohibits a person from engaging in

sexual conduct with another person who is not his or her spouse when the other person is less than

thirteen years of age.   R.C. 2907.02(B) states that "[w]hoever violates this section is guilty of rape,

a felony of the first degree."   The statute thus refers to the name of the crime generically, rather

than particularly with respect to which subdivision the defendant violated.   The judgment entry

does not include any of the elements of the offense, but it does recite the particular statute and

subdivision.   No other facts of the crime appear in the judgment entry.

{¶ 54}   The question presented, then, is whether referring to the name of the crime by

reference to its elements exceeds the scope of cross-examination.   More specifically, the issue is

whether naming the crime by reference to its elements constitutes a detail of the crime, an

aggravating circumstance of the crime, or merely the name of the crime.   To our knowledge, no

other Ohio court has examined this precise issue.   We do find it difficult to conceive that merely

referring to the crime's elements, without delving into specific details related to that offense, would

run afoul of the prohibition.   In the case at bar, however, we find it unnecessary to determine

whether the prosecutor exceeded the scope of cross-examination by referring to the crime as raping

a child under the age of thirteen.   Instead, we believe that any error that may have occurred

constitutes harmless error.

{¶ 55}   "Error in the admission of evidence is harmless if there is no reasonable possibility

that the evidence may have contributed to the accused's conviction."   State v. Bayless, 48 Ohio

St.2d 73, 106, 357 N.E.2d 1035 (1976), vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct.

3135, 57 L.Ed.2d 1155.   As we explain in our discussion of appellant's second assignment of error

overwhelming evidence supports his conviction.   Thus, we see no danger that the jury convicted

appellant because the state referred to appellant's prior conviction as raping a child under the age

of thirteen. Consequently, we do not believe that a reasonable possibility exists that this evidence, even if improperly admitted, contributed to appellant's conviction.

{¶ 56} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

{¶ 57} In his second assignment of error, appellant argues that his convictions are against the manifest weight of the evidence and that sufficient evidence does not support them. He contends that the state's allegedly improper reference to his prior conviction as raping a child under thirteen years of age caused the jury to discredit his testimony. Appellant claims that if the evidence had been excluded, the jury would have determined that appellant's testimony–and the testimony of his corroborating witnesses–was more believable than the victim's "unsupported testimony." Appellant further argues that the victim's testimony was not as trustworthy because the state did not present any witnesses who corroborated the victim's testimony, while appellant presented his mother's, his former romantic partner's, and his former partner's daughter's testimony, all of which largely corroborated his testimony.

{¶ 58} Initially, we observe that although appellant combines the sufficiency and manifest weight of the evidence arguments, "sufficiency" and "manifest weight" present two distinct legal concepts. See State v. Thompkins, 78 Ohio St.3d 380, 678 N.E.2d 541, syllabus (1997). When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. See Thompkins, 78 Ohio St.3d at 386 ("sufficiency is a test of adequacy"); State v. Jenks, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991). The standard of

review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Jenks, 61 Ohio St.3d at 273. Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).

{¶ 59} Thus, when reviewing a sufficiency-of-the-evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. See State v. Hill, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); State v. Grant, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency-of-the-evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. See State v. Tibbetts, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); State v. Treesh, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶ 60} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." Thompkins, 78 Ohio St.3d at 387. When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. See State v. Issa, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); State v. DeHass, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dis. 1983).

{¶ 61} If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. See State v. Eley, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus. A reviewing court should find a conviction against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, 78 Ohio St.3d at 387, quoting Martin, 20 Ohio App.3d at 175; see also State v. Lindsey, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 62} When reviewing evidence under the manifest weight of the evidence standard, an appellate court will generally defer to the fact-finder's credibility determinations. As we stated in State v. Murphy, Ross App. No. 07CA2953, 2008–Ohio–1744, ¶31:

{¶ 63} "It is the trier of fact's role to determine what evidence is the most credible and convincing. The fact finder is charged with the duty of choosing between two competing versions of events, both of which are plausible and have some factual support. Our role is simply to insure the decision is based upon reason and fact. We do not second guess a decision that has some basis in these two factors, even if we might see matters differently."

Accord Bugg v. Fancher, Highland App. No. 06CA12, 2007–Ohio–2019, ¶9.   In line with this

same reasoning, the Second District Court of Appeals explained:

> "'Because the factfinder * * * has the opportunity to see and hear the
> witnesses, the cautious exercise of the discretionary power of a court of appeals to
> find that a judgment is against the manifest weight of the evidence requires that
> substantial deference be extended to the fact finder's determinations of credibility.
> The decision whether, and to what extent, to credit the testimony of particular
> witnesses is within the peculiar competence of the fact finder, who has seen and
> heard the witness.'"

State v. Cunningham, 2nd Dist. No. 11CA0032, 2012-Ohio-2333, ¶18, quoting State v. Lawson, 2nd

Dist. No. 16288 (Aug. 22, 1997).   Accordingly, a reviewing court "will not substitute its judgment

for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the

trier of facts lost its way in arriving at its verdict."   Cunningham, at ¶19, citing State v. Bradley,

2nd Dist. No. 97–CA–03 (Oct. 24, 1997).   Merely arguing, therefore, that the jury's verdict is

against the manifest weight of the evidence because it believed the state's witnesses over a

defendant's ordinarily will not be a basis for reversing a conviction.   State v. Fell, 6th Dist. No.

L-10-1162, 2012-Ohio-616, 2012 WL 525517, *4 ("That the jury heard conflicting accounts is not

alone a basis for reversal.   It is not against the 'manifest weight' of testimonial evidence for the

jury to choose to believe the victim over defense witnesses where it could reasonably make that

choice."); State v. McDowell, 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶62 ("A conviction is not

against the manifest weight of the evidence merely because the jury believed the prosecution

testimony.").

{¶ 64}   When an appellate court concludes that the weight of the evidence supports a

defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence

supports the conviction.   See <u>State v. Pollitt</u>, 4th Dist. No. 08CA3263, 2010-Ohio-2556, ¶15.

"'Thus, a determination that [a] conviction is supported by the weight of the evidence will also be

dispositive of the issue of sufficiency.'"   <u>State v. Lombardi</u>, 9th Dist. No. 22435, 2005-Ohio-4942,

¶9, quoting <u>State v. Roberts</u>, 9th Dist. No. 96CA006462 (Sept. 17, 1997).   In the case sub judice,

therefore, we first consider whether appellant's conviction is against the manifest weight of the

evidence.

{¶ 65}  In the case at bar, we believe that the record contains ample competent and credible

evidence to support appellant's felonious assault and kidnapping convictions.   In other words, the

jury did not commit a manifest miscarriage of justice by believing the state's evidence over

appellant's.

{¶ 66}  The felonious assault statute prohibits a person from knowingly causing serious

physical harm to another.   R.C. 2903.11(A)(1).   The kidnapping statute, under which appellant

was convicted, provides:

> (A) No person, by force, threat, or deception, * * * by any means, shall
> remove another from the place where the other person is found or restrain the liberty
> of the other person, for any of the following purposes:

> * * * *

> (3) To terrorize, or to inflict serious physical harm on the victim or another.

R.C. 2905.01(A)(3).

{¶ 67}  Appellant does not dispute whether the state presented evidence regarding each one

of the elements.   Instead, he disputes whether the state presented trustworthy evidence to prove the

elements.   Basically, he argues that because he presented three witnesses to corroborate his

testimony and the state presented no witness to corroborate the victim's testimony, the state's

evidence cannot be considered trustworthy.   Appellant's argument, in essence, requests us to conclude that a victim's uncorroborated testimony is not sufficient to support a conviction and that reliance upon such uncorroborated testimony to convict a defendant would result in a conviction that is not supported by the manifest weight of the evidence.

{¶ 68} Unfortunately for appellant, credibility is not a numbers game.   Testimony does not become credible simply because multiple witnesses support a defendant's theory.   Those witnesses may have significant biases or their testimony may lack credibility.

{¶ 69} In the case sub judice, the defense witnesses had possible biases.   For instance, Britt, appellant's mother, may have been biased.   Her testimony that she would not lie for appellant became suspect when she denied that she "love[s] him no matter what he does."   The prosecutor asked Britt whether her statement meant that she "quit loving [appellant] because he does certain things," and she stated, "You know what I mean."   Moreover, Dixon, his life-long friend and former romantic partner, also may have been biased.   Although she denied that she would lie for appellant, the jury was wholly entitled to find her claim specious.

{¶ 70} Additionally, the state undermined the credibility of each witness during cross-examination.   For instance, appellant's two witnesses who observed the victim at Dixon's party claimed that the victim fell flat on her face, without attempting to break her fall with her arms.   On cross-examination, the prosecutor suggested that it is highly unusual for a person to fall in that manner, "like a tree," without any attempt to break the fall.   The jury could have employed its collective common sense to decide that the witnesses who claimed the victim fell face first into the floor, "like a tree," were exaggerating or outright lying.

{¶ 71} Dixon testified at trial that appellant did not actually pull the victim from the truck,

yet in a written statement she gave police days after the incident, she stated that appellant had

pulled the victim from the truck.   On cross-examination, Dixon stated that she "could have been

wrong now or then."   The prosecutor then obtain Dixon's admission's that her written statement

likely contained the accurate version of the incident.   Thus, Dixon discredited herself by giving

contrary testimony.

{¶ 72} When the prosecutor cross-examined appellant regarding the manner by which the

victim's hair was removed, appellant had no viable explanation.   He simply did not believe it was

possible.   The undisputed facts, however, show that the hair was removed while the victim was

with appellant.   Deputy Hamilin stated that when he took photographs of the victim shortly after

appellant's arrest, the chunk of hair had already been removed.   Not one of appellant's witnesses

stated that they saw the victim with a chunk of missing hair on her head.   The jury's only logical

inference was that someone caused the chunk of hair to be removed from the victim's head and the

only someone who was with the victim was appellant.   Although appellant claimed that he did not

know when Deputy Hamilin took the victim's photograph and thus implied that the victim could

have removed the hair on her own after the December 10-11 events, the prosecutor pointed out to

appellant that the deputy testified that the photographs were taken shortly after appellant's arrest on

the morning of December 11.   Thus, the jury could have decided appellant's entire story lacked

any credibility due to his inability to state how the victim's hair was removed.   His explanation

that he did not think it was possible obviously did not satisfy the jury.

{¶ 73} In the end, the jury had the opportunity to see and to hear appellant and his

witnesses and apparently determined that none provided a credible account of the victim's injuries.

 Furthermore, our review of the record fails to reveal that the jury was patently wrong to credit the

state's evidence over appellant's.   The jury could have reasonably determined that appellant and his witnesses did not present credible testimony.

{¶ 74} The victim's testimony, if believed, establishes the elements of both crimes. Moreover, two totally disinterested witnesses supported the state's theory of the case.   Snyder, the driver who stopped to inquire whether appellant needed assistance with his stalled vehicle, testified that the victim appeared to be in distress.   The responding deputy likewise stated that the victim appeared to be in distress.   He stated that she had difficulty explaining what had happened to her. Moreover, the photographs that the state submitted speak volumes.   They depict serious injuries to the victim's head.   Upon reviewing the photographs, the jury reasonably could have concluded that the victim's injuries did not occur by falling into a bow-flex machine, as appellant and his witnesses claimed.   One of the photographs shows a "snowball" size chunk of hair missing from the victim's hair.   The jury apparently concluded that appellant failed to offer a sufficient rationale as to how this injury could have occurred if someone had not intentionally ripped it from her head. Appellant's claim that he did not believe this type of injury was possible apparently did not sway the jury to credit his story.   We do not believe that the jury committed a manifest miscarriage of justice by crediting the victim's testimony and the state's other witnesses' testimony over appellant's and his corroborating witnesses' testimony.

{¶ 75} Appellant nevertheless asserts that the jury improperly discredited his and his witnesses' testimony due to the state's improper reference to his prior conviction as raping a child under thirteen years of age.   Even if, for purposes of argument, that we assume that this reference was improper, our analysis set forth above sufficiently explains why the jury may have disbelieved appellant's and his witnesses' testimony.   Even had the jury heard nothing about appellant's prior

conviction, the state pointed out sufficient questions and inconsistencies about appellant's and his witnesses' testimony.

{¶ 76} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's second assignment of error.

III

{¶ 77} In his third assignment of error, appellant asserts that trial counsel's failure to object to the prosecutor's alleged misconduct during closing argument constitutes ineffective assistance of counsel. Appellant contends that the prosecutor improperly commented on the state's witnesses' credibility and disparaged appellant's witnesses' credibility. Specifically, he complains that the prosecutor improperly asserted: (1) Dixon's and Rebecca's testimony was not "creditable" [sic]; (2) "you'd have to be a fool" to believe appellant's story; (3) the state's case was credible and appellant's incredible; and (4) appellant "made the State's case look so good because he is so 'incredible' [sic]." He argues that a reasonable probability exists that the prosecutor's comments persuaded the jury to believe the state's evidence over appellant's. Appellant thus argues that his counsel's ineffective assistance of counsel in failing to object to the prosecutor's statements entitles him to a new trial.

A

INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 78} Criminal defendants have a right to counsel, including a right to the effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); State v. Stout, Gallia App. No. 07CA5, 2008–Ohio–1366, ¶21. To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's

performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Issa, 93 Ohio St.3d at 67, 752 N.E.2d 904; State v. Goff, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998).

> "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."

State v. Conway, 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶95 (citations omitted). "Failure to establish either element is fatal to the claim." State v. Jones, 4th Dist. No. 06CA3116, 2008–Ohio–968, ¶14. Therefore, if one element is dispositive, a court need not analyze both. State v. Madrigal, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶ 79} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." State v. Taylor, 4th Dist. No. 07CA11, 2008–Ohio–482, ¶10, citing State v. Smith, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v. Gondor, 112 Ohio St.3d 377, 2006-Ohio–6679, 860 N.E.2d 77, ¶62; State

v. Hamblin, 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

**{¶ 80}** Trial counsel's failure to object to alleged instances of prosecutorial misconduct "does not necessarily constitute ineffective assistance" of counsel. State v. Perez, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶230; State v. Tenace, 109 Ohio St.3d 255, 2006–Ohio–2417, 847 N.E.2d 386, ¶62. That is, a failure to object does not necessarily fall below an objective standard of reasonableness. Instead, a failure to object to alleged instances of prosecutorial misconduct may be considered sound trial strategy. State v. Brown, 5th Dist. No. 2007CA15, 2008-Ohio-3118, ¶58 (stating that failure to object to prosecutor's statements during closing arguments may have been trial strategy and thus did not constitute deficient performance). "'A competent trial attorney might well eschew objecting * * * in order to minimize jury attention to the damaging material.'" State v. Mundt, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶90, quoting United States v. Payne, 741 F.2d 887, 891 (C.A.7, 1984). Accord State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶42 (stating that "[a] reasonable attorney may decide not to interrupt his adversary's argument as a matter of strategy"); State v. Clay, 7th Dist. No. 08MA2, 2009-Ohio-1204, ¶141 (stating that "[l]imiting objection during closing is a trial tactic to avoid trying to draw attention to statements"). Thus, in order to establish that trial counsel performed deficiently by failing to object to error at trial, the defendant ordinarily must demonstrate that the error "is so compelling that competent counsel would have been obligated to object to [it] at trial." State v. Hale, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶233. Additionally, counsel's performance cannot be deemed deficient for failing to raise non-meritorious objections. Mundt at ¶119.

**{¶ 81}** If a defendant shows that trial counsel performed deficiently by failing to object to

error at trial, the defendant then must demonstrate that the failure to object prejudiced the defense. To establish prejudice, a defendant must demonstrate that a reasonable probability exists that but for counsel's errors, the result of the trial would have been different. State v. Short, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶113; State v. White, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998); State v. Bradley, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. Furthermore, courts may not simply assume the existence of prejudice, but must require the defendant to affirmatively establish prejudice. State v. Clark, 4th Dist. No. 02CA684, 2003–Ohio–1707, ¶22; State v. Tucker, 4th Dist. No. 01CA2592 (Apr. 2, 2002).

{¶ 82} In the case at bar, we believe that appellant is unable to establish that trial counsel's failure to object to the alleged instances of prosecutorial misconduct constituted deficient performance. Appellant's trial counsel rationally could have decided that objecting to the prosecutor's alleged instances of misconduct would further focus the jury's attention on appellant's and his witnesses' credibility. Moreover, trial counsel rationally could have determined that the better strategy was to allow the prosecutor to continue his closing argument without interruption. Furthermore, as we explain below, counsel's objections would have been non-meritorious. Thus, trial counsel's performance was not deficient. Even if we were to assume that trial counsel's failure to object in the case sub judice amounted to deficient performance, appellant cannot demonstrate that counsel's allegedly deficient performance prejudiced the defense. As we explain below, had counsel objected, there is no reasonable possibility that the result of the trial would have been different. That is, had counsel objected, there is no reasonable possibility that the trial court would have sustained counsel's objection and determined that the prosecutor's alleged misconduct was so pervasive as to deprive appellant of a fair trial.

{¶ 83} In order for a defendant to establish prosecutorial misconduct during closing argument, the defendant must show that (1) the remarks were improper, and (2) these improper remarks prejudicially affected the defendant's substantial rights.   State v. Powell, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶149; State v. Davis, 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶231; State v. Smith, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).   To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different.   State v. Moore, 2012-Ohio-1958, 970 N.E.2d 1098, ¶76 (8th Dist.); State v. Porter, 4th Dist. No. 10CA15, 2012-Ohio-1526, ¶20; State v. Morgan, 9th Dist. No. 07CA0124-M, 2008-Ohio-5530, ¶21.   Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal."   State v. Landrum, 53 Ohio St.3d 107, 112, 559 N.E.2d 710 (1990).   "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" State v. Lang, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶155, quoting Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 84} During closing arguments, the prosecution is generally given wide latitude to convincingly advance its strongest arguments and positions.   Powell at ¶149; State v. Phillips, 74 Ohio St.3d 72, 90, 656 N.E.2d 643 (1995); Treesh, 90 Ohio St.3d 466, 739 N.E.2d 749. Nevertheless, a prosecutor must avoid going beyond the evidence presented to the jury to obtain a conviction.   Smith, 14 Ohio St.3d at 14.   "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." State v. Fears, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). Further, an appellate court must not focus on isolated comments but must

examine the prosecution's closing argument in its entirety to determine whether the prosecutor's comments prejudiced the defendant.   Treesh, 90 Ohio St.3d at 466; State v. Keenan, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 85}  During closing argument, prosecutors "may not express their personal beliefs or opinions regarding the guilt of the accused."    State v. Lott, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990).   They also may not express their personal beliefs or opinions regarding a witness's credibility.   State v. Williams, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997).   "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue."   Davis, 116 Ohio St.3d 404, ¶232, citing State v. Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶117.   The prosecutor is, however, permitted to fairly comment upon the testimony and evidence.   Mundt at ¶119; State v. Dovala, 9th Dist. No. 05CA8767, 2007-Ohio-4914, ¶20; State v. McGlothin, 1st Dist. No. C-060145, 2007-Ohio-4707, ¶23.   "The prosecution is certainly free to point out discrepancies in the evidence and flaws in a defendant's version of evidence and evidence, but should refrain from using harsh terms or labels that may tend to limit or discourage the actual focus on the evidence."   State v. Conley, 4th Dist. No. 08CA784, 2009-Ohio-1848, ¶30.

{¶ 86}  Thus, a closing argument that sets forth reasons "to deem * * * testimony * * * unreliable does not amount to the prosecutor giving a[ personal] opinion."   State v. Williams, 8th Dist. No. 97039, 2012-Ohio-1741, ¶19.   Instead, "it merely invites the jury to weigh the credibility."   Id. at ¶19.   Moreover, a prosecutor does not express an opinion when a prosecutor asks "the jurors to decide for themselves whether the[] witnesses were being truthful."   Davis, 116 Ohio St.3d 404, ¶235; State v. Green, 90 Ohio St.3d 352, 374, 738 N.E.2d 1208 (2000) (finding

that the prosecution did not vouch for a witness in closing arguments but instead "argued facts to support [the witness's] credibility"). A prosecutor may comment in closing argument on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn from it. State v. Lott, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). A prosecutor does not improperly vouch for a witness's credibility by arguing, based upon the evidence, that a witness was "a reliable witness to the simple events she witnessed, that she lacked any motive to lie, [or] that her testimony was not contradictory." Green, 90 Ohio St.3d at 373-374 (2000).

**{¶ 87}** In the case sub judice, we do not agree with appellant that the prosecutor improperly vouched for any witness or improperly commented on appellants' or his witnesses' credibility. Rather, the prosecutor reminded the jury that the jurors were to decide whether the witnesses were being truthful. He informed the jury that it must "decide who to believe" and then set forth the basic instructions that the court would give the jury regarding its role in evaluating the credibility of the witnesses. Following these statements, the prosecutor stated: "I submit to you that the evidence presented by the defense * * * is not worthy of belief. The evidence presented on behalf of the State in this case is quite worthy of belief. Let's talk about it a little bit." The prosecutor then argued that among the defense witnesses, "there seemed to be some lack of memory and there was discrepancies." He pointed out more specifically the defense witnesses' testimony and the discrepancies and inconsistencies. For example, he argued that Dixon's testimony regarding whether appellant pulled the victim from the truck was inconsistent with an earlier statement that she gave to law enforcement officers. The prosecutor also suggested that Dixon's testimony that appellant intentionally pulled the victim's hair contradicted appellant's testimony that he might have accidentally pulled it.

{¶ 88} The prosecutor also pointed out the defense witnesses' biases. He further asserted that some of the defense witnesses' testimony did not make sense. The prosecutor did not imply that he possessed knowledge of facts outside the record or placed his own personal credibility at issue. Instead, the prosecutor argued that based upon the evidence presented at trial, the state's witnesses presented the more credible account of the events. Furthermore, the prosecutor argued that the defense witnesses' accounts were not credible based upon the evidence presented at trial and the reasonable inferences that could be drawn from it. The prosecutor's comments constituted fair comment on the witnesses' credibility based upon their testimony. The prosecutor's closing argument presented the reasons why appellant's and his witnesses' testimony was not reliable or credible and thus did not amount to the prosecutor giving a personal opinion regarding credibility. Instead, the argument pointed out the discrepancies, inconsistencies, and lack of reasonable explanations among the defense witnesses and invited the jury to weigh the witnesses' credibility. Thus, the comments were not improper.

{¶ 89} Moreover, even if some of the prosecutor's comments could be considered to be improper, appellant cannot show that those allegedly improper comments affected the outcome of the trial. As we explained in our discussion of appellant's second assignment of error, overwhelming competent and credible evidence supports appellant's convictions. If the jury had been instructed to disregard the prosecutor's alleged instances of misconduct during closing argument, we find it extremely unlikely that the jury would have acquitted appellant or would have been unable to reach a verdict. As we explained in our discussion of appellant's second assignment of error, the jury was well-within its fact-finding role to completely discredit appellant's and his witnesses' testimony. Appellant's testimony, even if the prosecutor had not

highlighted the inconsistencies in his and his witnesses' testimony, bore scant indicia of credibility.

Additionally, the allegedly improper comments did no so pervade the closing argument such that appellant was denied a fair trial.   Thus, we cannot state that trial counsel's failure to object to the prosecutor's alleged instances of misconduct impacted the result of the trial.   Consequently, appellant is unable to show that any improper comments deprived him of a fair trial.   As a result, he also is unable to demonstrate that trial counsel's alleged deficient performance in failing to object to the alleged instances of prosecutorial misconduct prejudiced his defense.   Consequently, appellant cannot establish an ineffective assistance of counsel claim.

**{¶ 90}** Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

<u>JUDGMENT ENTRY</u>

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted.   The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court.   The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court.   Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Kline, J. & McFarland, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele
Presiding Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.