[Cite as *State v. Stodgel*, 2024-Ohio-5182.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,             : CASE NO. 23CA15

    v.                              :

BRANDON C. STODGEL,                     : DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.            :

_____

APPEARANCES:

Peter Galyardt, Assistant State Public Defender, Columbus, Ohio,
for appellant[1].

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C.
Wells, Assistant Prosecuting Attorney, Chillicothe, Ohio, for
appellee.

_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:10-23-24
ABELE, J.

    **{¶1}** This is an appeal from a Ross County Common Pleas Court
judgment of conviction and sentence.  Brandon Stodgel, defendant
below and appellant herein, assigns two errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "BRANDON STODGEL'S TRIAL COUNSEL RENDERED
> INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION
> OF HIS CONSTITUTIONAL RIGHTS.  FOURTH, SIXTH,

---

[1]  Different counsel represented appellant during the trial
court proceedings.

AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10, 14, AND 16, OHIO CONSTITUTION; *STRICKLAND V. WASHINGTON*, 466 U.S. 668, 104 S.CT. 2052, 80 L.ED.2D 674 (1984). TRIAL TR. 97-101, 103-105, 109-115, 276-278."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN IT SENTENCED BRANDON STODGEL TO A CONSECUTIVE SENTENCE THAT THE RECORD CLEARLY AND CONVINCINGLY DOES NOT SUPPORT. R.C. 2929.14(C)(4); R.C. 2953.08. MAY 22, 2023 JUDGMENT ENTRY OF SENTENCE."

**{¶2}** In March 2022, a Ross County Grand Jury returned an indictment that charged appellant with (1) one count of aggravated robbery in violation of R.C. 2911.01, a first-degree felony, with a repeat-violent-offender specification as defined in R.C. 2929.01 and a firearm specification, (2) one count of aggravated robbery in violation of R.C. 2911.01, a first-degree felony, with a repeat-violent-offender specification as defined in R.C. 2929.01 and a firearm specification, (3) one count of burglary in violation of R.C. 2911.12, a third-degree felony, and (4) one count of having weapons while under disability in violation of R.C. 2923.13, a third-degree felony. Appellant entered not guilty pleas.

**{¶3}** At trial, Ross County Sheriff's Deputy Benjamin Roderick testified that at approximately 4:30 p.m. on February 22, 2022, dispatch notified him of a "burglary in progress" with two suspects

and shots fired.  Roderick arrived at the scene at 4:38 p.m. and observed several people standing at the end of the driveway. Roderick also observed a red and white Ford F 150 pickup truck in the front yard with muddy tracks behind it and "several shotguns and rifles and other miscellaneous items in the front."

{¶4} Deputy Roderick spoke with Shane Morris, who yelled from the house next door that "two individuals had run off into the woods."  After he attempted to search the woods, Roderick called for a canine and aviation unit.  As officers prepared to deploy the canine, a witness informed Roderick of an orange Honda Element down the street that "appeared to be picking up two people that had walked out of the wood line."  Roderick observed two individuals enter the Honda and "tak[e] off."  After a slow-speed chase, the Honda stopped and officers ordered the five occupants to exit. Caitlynn Ratliff appeared "disheveled and dirty as if she had just been walking through the woods, briars, mud on her pants and shoes," and appellant looked the same and had "mud on his boots and . . . pants."

{¶5} Michael LeMaster owns the home in question, but also lived at another residence with his girlfriend.  LeMaster stopped at the home "about once a day and get my mail or every other day," and maintained the utilities.  After Shane Morris called LeMaster,

he drove to the scene and met with Morris and the sheriff's department.  LeMaster noticed the "window was broke out."  The suspects apparently entered the home through a broken window in the garage (no door in the garage connected to the house).  "They broke the gun case, the glass out of the gun case and stuff."  The burglars removed the drawer from the nightstand.  LeMaster observed that guns, ammunition, coins, knives, and jewelry were also missing.  Outside, "they took a bicycle and motorcycle out of the garage and put it out in the back."  In addition, LeMaster noticed the red and white pickup truck stuck in the front yard and looked inside the cab, where he saw "everything you got in these pictures," meaning the items stolen from his home.

{¶6}  LeMaster stated that he last visited the property "a day or two before," and that Caitlyn Ratliff, "the mother of [LeMaster's] grandkids," had previously visited the home.  LeMaster, however, did not permit Ratliff or anyone else to enter his home or remove anything.

{¶7}  On cross-examination, counsel asked LeMaster if he used this home for "storage" of personal property, to which LeMaster replied, "No.  All my furniture and stuff is still in there."  LeMaster agreed that the property was "unoccupied," but added that he kept clothes there.  LeMaster also acknowledged that Ratliff

would have known that no one resided at the property.  LeMaster testified that when he visits the property, he "might be there two or three hours, four hours," and he could stay if he chose to.

{¶8}  Ross County Sheriff's Detective Brenton Davidson testified that Ross County Sheriff's Captain Stanley Addy instructed him to investigate the incident.  When Davidson arrived, he observed officers gathered around an orange Honda Element. Davidson inventoried the Element while Addy photographed the contents, including a firearm.  Davidson then drove to the residence and photographed (1) the F-150 pickup truck stuck in the mud in the front yard, (2) the residence, (3) the residence's front porch, (4) 12-gauge shotgun shells found in the gravel driveway next to a package of wadding for muzzle loaders, (5) tire marks in the front yard, (6) a gate "broken to gain entry to the back yard", (7) a cell phone Davidson found in "the back yard portion of the residence," (8) the truck's interior, (9) "some trash bags that were located inside the truck containing various items," (10) some items from the trash bag in the truck, (11) commemorative quarter collection in one trash bag, (12) gun barrels, (13) shotgun shells that came from a trash bag, (14) a firearm, (15) a broken window in the attached garage that led to the kitchen, and (16) items on the kitchen counter "that had been pushed off or moved."  Davidson

inventoried the F-150 pickup truck and transported the evidence to the station.  Davidson also explained that when he found a cell phone in the driveway, he clicked the home button to determine the cell phone's owner and discovered it belonged to Shane Morris.

**{¶9}**  Shane Morris testified that as he drove to the scrap metal yard, he passed Mike LeMaster's home and noticed "a strange vehicle sitting in my buddy's driveway."  Morris described it as "a white and orange Ford F-150.  It had been beat up, windows broke out of it."  Morris called LeMaster to report this and continued to the scrap yard.  On his return, he again noticed the vehicle, so he blocked it and "observed two people coming out of [the home]" carrying "trash bags with stuff in it * * * so I knew they were there robbing his house."

**{¶10}** Morris tried to call 911 but could not connect, so he took photos of the truck and license plate, and "then I observed Mr. Stodgel get in the truck and then he rammed my vehicle and tried to get around it and ... then he got stuck in the yard."  Morris then exited his vehicle and appellant:

> got out with a gun and I'm sitting there taking video of
> him, he points a gun at my head and says give me your phone
> so I'm like okay.  I give him my phone.  Then he jumps into
> my Tahoe and I said man, you're not taking my vehicle.  He
> said okay, you get in it and push me out.  He wanted me to
> push him out of the yard onto the road and I said okay.
> So when I got into my vehicle, I just hurried up and backed
> out of the driveway and took off and when I took off, he

fired two shots at me across the road.

{¶11} As Morris left the scene, appellant stood in the yard and Caitlynn Ratliff sat in the truck.  Morris said that "was the last time I had saw them until they come out of the woods."  Morris then drove to a friend's home and asked his wife to call 911.  When Morris returned to speak with law enforcement, he observed two people "come out of the woods and get in a car and I said right there they are and ... the state highway patrolman took off after them."

{¶12} Captain Stanley Addy testified that he was training Brenton Davidson as a new detective when dispatch summoned.  At the traffic stop of the orange Honda Element, Addy and Davidson searched the Element with owner Leona Hickman's consent.  Addy found loose coins, a Honda 4-Wheeler key, knives, jewelry, a jewelry box, and a brown jacket with rolled up coins and a women's watch.  Addy also found two 9 mm live cartridge shells on the floorboard and observed the butt of what appeared to be a firearm sticking out of the hatchback.  Addy described the firearm as an "intel firearms fire star plus."  Addy found two "loose rounds" in the vehicle's cabin and the magazine contained eight rounds.  LeMaster came to the scene and "identified all the items on the seat [of the Element] as his from being out of his residence but he

claimed that this firearm was not his out of his residence."

**{¶13}** Captain Addy also spoke with appellant, who advised Addy that he had "hung himself. He did it this time." Appellant repeatedly stated that Steven, Leona, and Alexa had "nothing to do with it" and were "just giving him a ride." Addy told appellant that Ratliff blamed him for entering the house. Appellant also "admitted that the gun located in the back of Leona's vehicle was his." Addy obtained appellant's DNA sample and inquired about the cell phone Detective Davidson found at the residence. Initially, appellant stated that the phone in the Element belonged to him, but "was out of minutes," so he had another phone. However, the phone Davidson found in the yard at the residence included a screen-saver photo of Mr. Morris and his family. Addy also noted that appellant and Ratliff "had mud on them. They appeared to be possibly going through woods or laying in the dirt." Addy explained heavy rains had created significant mud. Addy also photographed Morris's vehicle and trailer and helped Davidson with evidence at the scene of the burglary.

**{¶14}** Approximately six days later, Captain Addy and Detective Davidson visited the jail at appellant's request. During this second interview

> Mr. Stodgel advised me at this point that he wasn't completely honest with me the night of. He wanted to be

honest with me now.  He was claiming that he sat in the truck the whole time until Caitlynn had - let me back up. He advised he was with a girl named Chloe earlier that day, dropped her off and Caitlynn needed a ride to her baby's grandpa's to pick some stuff up.  They were supposed to meet a Terry LeMaster and she was supposed to get some items.  He advised he took her there.  He sat in the truck and she goes out and goes around to the rear of the residence and was gone forever, comes walking back to the truck carrying a bag or bags.  I can't remember if he said bag or bags - - one of them busted or ripped and she dropped some items and he claimed he got out to help her pick the items up and noticed some was shotgun shells or something to that effect, I'm just going off memory here.  And he's helping pick these items up to put in the truck, she's going back to the side of the house to get more items and bringing back when an SUV . . .pulled in behind him, and Caitlynn was hollering we got to go, we got to go.  He said he panicked, jumps in the truck, slips the clutch, hits it when Caitlynn is telling him to drive through the yard so he drives - - pulls into the yard, gets his truck stuck. He gets out to try to talk with the guy . . . who is hollering at him that they're going to - - he's calling the Sheriff on him and they take off running and he hears two shots as they run away, him and Caitlynn.

**{¶15}** Captain Addy added that appellant also told him he "did not have a gun."  Addy, however, stated, "that's not what you told me on the night of the stop," and explained that appellant asked him to play the recording, "so I played my recording of him admitting the gun from the traffic stop located in the Element was his and he, at that point, said I shouldn't have told you that and our interview was over."  Addy explained that, even though appellant gave him a voluntary DNA sample at the scene, Addy did not send the sample along with the firearm found in the Element for

testing because appellant admitted at the scene that he owned the weapon. Addy also explained that officers did not fingerprint the residence because Ratliff had been in the house prior to the incident, and witnesses observed them both "packing stuff from the rear of the house out." In addition, LeMaster told officers that many of the stolen items belonged to his deceased wife, and Addy described LeMaster as "very distraught." Addy explained, "I didn't feel the need to go in there and defile or ruin any more of Mr. LeMaster's deceased wife's property by ruining anything with black powder dust." In addition, Ross County Sheriff's Evidence and Property Technician Thomas Hamm testified that he test-fired the semi-automatic weapon and found it fully operational.

{¶16} At the close of appellee's case, appellant made a Crim.R. 29 motion for judgment of acquittal and argued that the burglary charge should be dismissed because the structure's owner testified it was unoccupied. In addition, appellant requested that one aggravated robbery charge be dismissed because "only one individual testified that they were robbed." The trial court denied the motion.

{¶17} Appellant testified in his own defense that he "was asleep at my Mom's, me and my fiancee Alexa Belkey," and when they awoke, Belkey's "forehead was swelled up" with an infection.

Because Belkey needed medical attention, appellant called Leona Hickman to drive her to the hospital. While Hickman and Steve Hickock drove Belkey to the hospital, appellant visited Chloe Sheffield and "sat there with Chloe for a little bit and Chloe didn't have no cigarettes." Because appellant only had "a couple," he told Sheffield he would "take her to Bainbridge and get her some." Appellant stated that he and Sheffield were halfway to Bainbridge when Caitlynn Ratliff called and asked if he could stop at her home. Appellant and Sheffield then drove to a gas station and "put twenty dollars in gas, bought two packs of cigarettes," then visited Ratliff. Appellant described Ratliff as "just a friend. I go over to her house and shoot tattoos [creating and applying tattoos]."

{¶18} Appellant explained that the previous night, he visited Ratliff's house to tattoo Ratliff's neck when she repeatedly asked him to "take her to her kids' grandfather's house to pick some property up of hers that she didn't want to get ruined." Appellant refused because it was 1:30 or 2:00 in the morning, and he had a borrowed truck that "didn't have good tags on it." Appellant also clarified, "I don't got a license."

{¶19} Appellant stated that he visited Ratliff the next day and she "kept begging me" to take her to LeMaster's home, so appellant

and Ratliff dropped off Chloe Sheffield and drove to LeMaster's home. Appellant explained that Ratliff told him that LeMaster "wasn't there yet," but said, "my stuff is already sitting out here and he told me to go ahead and get it." Appellant testified that Ratliff left the truck for five or ten minutes and returned with a black trash bag with pants hanging out. A couple of boxes also fell from the trash bag, and appellant noticed shotgun shells. Appellant stated that Ratliff retrieved another "load" when Morris pulled in. Appellant also explained that the clutch slipped and

> the truck jumped and I struck dude's truck and she [Ratliff] told me to just pull out through the yard, so I tried to go through the yard and I got stuck. He was out of the truck screaming I'm calling the Sheriff, I'm calling the Sheriff, and I tried to get out and tell him what was going on and when I did, she jumped out of the truck and took off running. So he jumped in the truck and backed up and he took off up the road. I didn't know what to do. I was scared. I got back in the truck and I shut it off and I left too.

{¶20} Appellant maintained that he "never one time entered that residence," denied he possessed a gun, denied he threatened Morris, and denied he possessed Morris's cell phone. Appellant said that once he entered the wood line, he ran when he heard a 12-gauge shotgun blast come from the house area. Appellant explained that he ran through the woods, called Alexa Belkey, told her his truck was stuck and asked for a ride. Soon thereafter, Leona Hickman,

Steve Hickock, and Belkey picked up appellant.

{¶21} Appellant further testified that he owned two phones on February 22, 2022, but claimed he did not possess Morris' cell phone. Appellant also stated that when Captain Addy spoke to him at the jail, he told him "what actually happened." Appellant explained:

> Alex had to go to the hospital that morning. Leona took her to the hospital. I went to Chloe's and I went to Bainbridge to get cigarettes and gas and once I went to get cigarettes and gas ... Caitlyn Ratliff had called me, asked me to come over there. She needed to go pick her stuff up from her kid's grandfather's and I told her I would give her a ride after I denied it the day before, so then she got in the truck with me and Chloe and once me and Chloe went, we dropped Chloe off so she could go to her Mom's wedding and on the way - - yeah, to South Salem, we dropped Chloe off and then went to Frankfort and once we got there, we sat there maybe ten minutes and she got a text. She said her stuff was already sitting out there, she could get it. She went around back and was gone maybe five, ten minutes, come back with a trash bag. It ripped. I got out, helped her get it, the stuff off the ground. She put the bag in the truck and went back around the side and come back with an armload of stuff and that's when the white truck pulled in. I slipped a clutch, pulled in the yard, and I got out and tried to speak with him. He said he was calling the sheriff and then he jumped in his truck and backed up and took off and she had ran into the woods.

{¶22} Appellant denied that he or Ratliff entered the property, denied he intended to commit a crime when he visited the property, and denied he discharged a firearm during the series of events. On cross-examination, appellant conceded he has "numerous prior felony

convictions." Appellee noted a (1) 2018 Marion County illegal conveyance of a drug of abuse into a detention facility conviction, (2) a 2012 Fayette County weapon under disability conviction, (3) a 2012 Fayette County grand theft of firearms conviction, (4) a Fayette County safe-cracking conviction, (5) a Fayette County possession of criminal tools conviction, and (6) a Highland County aggravated robbery with a gun specification conviction. Appellee then asked if appellant "found [himself] in a similar situation" in this case, to which appellant replied, "No, Ma'am."

{¶23} Appellant maintained that on the day in question, he stayed in the truck other than to help Caitlynn Ratliff collect items that fell from the ripped trash bag. He also observed Ratliff with a blanket covering items. Appellant said he observed pants, "a couple little tin boxes," and "some shotgun shells" fall out of the trash bag. Appellant also testified that he "accidentally" backed into Shane Morris. Appellant explained that when Morris said he planned to call the sheriff, Ratliff "got scared" and they ran into the woods and then "went up the road because we didn't stay back there because somebody come and shot a gun... into the woods." Appellant believed Morris shot into the woods. Appellant also admitted he told Captain Addy he owned the firearm found in the Honda Element.

{¶24} Alexa Belkey testified that she is appellant's fiancee and that Caitlynn Ratliff is a friend. At Ratliff's apartment on February 21, 2022, appellant "was giving tattoos" when Ratliff asked for a ride, but it was late. Appellant and Belkey "just decided to go home." Belkey did not overhear the discussion regarding where Ratliff wished to go because she "went to the emergency room." Belkey then received a call from appellant on the evening of February 22 when "he had asked for us to come help him get his truck out of the mud." Belkey rode with Leona Hickman and a man named Hickock to the scene and picked up appellant while "it was still daylight, so evening time." Belkey stated that, after the group picked up appellant, police conducted a traffic stop and "pulled us all out one by one" to question them. Belkey said law enforcement "asked why I was there and I said that his truck was stuck in the mud and that's what we were there for." Belkey denied being asked to participate in a burglary. On cross-examination, Belkey admitted that she did not know appellant was with Ratliff or Chloe Sheffield on February 22 after Belkey visited the hospital. Belkey also stated that she did not know what appellant did between the time she went to the hospital in the early afternoon and when the group picked up appellant later that evening. At that juncture, the defense rested and appellee called two rebuttal witnesses.

{¶25} Shane Morris, appellee's first rebuttal witness, testified that, after appellant rammed his Chevy Tahoe with the Ford pickup truck, Morris drove to his friend's house and his friend drove him to the property ten to fifteen minutes later. During that time, Morris called the police. Morris also stated that he did not fire a weapon at the property or even have a firearm with him that day.

{¶26} Appellee also called Detective Davidson in rebuttal. Davidson testified that when he collected the trash bag from the F-150 truck stuck in the yard, it did not appear to have any tears or rips. Davidson stated, "from my vehicle into the law complex, I used that as one of the main bags to carry because there was so many other loose items to put on the cart. . . the bag was well intact." Davidson further testified that after they removed, inventoried, and photographed the items from the bag, he discarded the bag.

{¶27} After deliberation, the jury found appellant guilty of (1) one count of aggravated robbery in violation of R.C. 2911.01, a first-degree felony, (2) one count of aggravated robbery in violation of R.C. 2911.01, a first-degree felony, and (3) one count of burglary in violation of R.C. 2911.12, a third-degree felony. In addition, appellant waived his right to jury trial and elected a

bench trial for the weapons under disability charge and, after hearing the evidence, the court found him guilty of the weapons charge. Moreover, the court determined that pursuant to R.C. 2941.149(B), appellant is a repeat violent offender as specified in counts one and two.

**{¶28}** The trial court sentenced appellant to (1) serve an 11 to 16.5-year prison term for count one aggravated robbery, 2) serve an 11 to 16.5.-year prison term for count two aggravated robbery, (3) serve the prison terms for counts one and two consecutively for a total 40-year minimum to a 45.5-year maximum, (4) serve a 24-month prison term for count four having a weapon while under disability, to be served concurrently with counts one and two, including a mandatory 2-year postrelease control term, (5) serve a new 489-day prison term for a postrelease control violation pursuant to R.C. 2929.141(A)(1)[appellant served a postrelease control term at the time of the commission of these felonies], to be served consecutively to the terms imposed on counts one and two, (6) serve a 2 to 5-year postrelease control term, and (7) pay $1,784.72 restitution to Shane Morris. The trial court also merged Counts 1 and 3, and appellee elected to sentence on Count 1. This appeal followed.

I.

{¶29} In his first assignment of error, appellant asserts that his trial counsel rendered ineffective assistance of counsel in violation of his constitutional guarantees. Specifically, appellant contends that counsel failed to prevent any mention to the jury of the repeat-violent-offender specification and the weapon-under-disability count and failed to prevent the admission of appellant's extensive criminal history for impeachment purposes.

{¶30} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶31} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *See Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Moreover, if one element is dispositive, a

court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶32} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.'" *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

{¶33} Further, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 2006-Ohio-2815, ¶ 95 (citations omitted). In addition, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Therefore, a defendant bears the burden of showing ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *e.g., State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶34} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." *Strickland*, 466 U.S. at 694; *e.g., State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis). " [T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Further, courts ordinarily may not simply presume the existence of prejudice but

must require a defendant to establish prejudice affirmatively. *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.).

{¶35} Moreover, we have recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.); *State v. Simmons*, 2013-Ohio-2890, ¶ 25 (4th Dist.); *State v. Halley*, 2012-Ohio-1625, ¶ 25 (4th Dist.); *State v. Leonard*, 2009-Ohio-6191, ¶ 68 (4th Dist.); *accord State v. Powell*, 2012-Ohio-2577, ¶ 86.


*Repeat Violent Offender Specification & Weapon Under Disability*

{¶36} Appellant contends that his trial counsel provided ineffective assistance when he failed to prevent any mention to the jury of the repeat-violent-offender specification and the weapon-under-disability count. Appellant argues that, although counsel attempted to prevent the jury from learning that appellant faced the repeat-violent-offender specifications and the weapons-under-disability count by opting to try those charges to the judge, because he did not resolve that issue prior to opening statements the prosecution mentioned those charges during its opening statement. Appellant deems counsel's failure constitutionally

deficient because, he contends, once the jury hears that those charges exist, the jury knows that appellant is a violent felon, particularly when appellee detailed the prior violent felony "having been convicted of a felony offense of violence, aggravated robbery, in violation of R.C. 2911.01 of the Ohio Revised Code, out of Highland County Court of Common Pleas on August 31st of 2006." Moreover, appellant argues that the prior conviction is for the same crime for which appellee charged him in the case at bar, which aggravated counsel's failure.

{¶37} Appellee, on the other hand, argues that in the instant case appellant's counsel did, as a trial tactic, choose to try to the bench the repeat-violent-offender specification and the weapon-under-disability count. Immediately after the court seated the jury, during a bench conference the following exchange occurred:

BREHM: We want to try the W.U.D. to the bench.

COURT: What's that?

BREHM: We want to try the W.U.D. to the bench.

COURT: Okay. So, you're not -

BREHM: I thought we would take a break before we did this. I just want to talk to him about pleading no contest to the W.U.D. but I will just waive it, and just try it to the bench.

COURT: Just the weapons under disability, but you're still left with two specifications you know that.

BREHM: I think the - I think the - the RVO specs is those

aren't heard by the jury is my understanding.

SCHUMAKER: Yes, but you have firearm specifications as well.

BREHM: Yeah, but the gun specs- the gun specs are his convictions from his prior record so that's why we try that to the bench strategy wise. I mean it's all done in the past.

COURT: Ms. Schumaker.

SCHUMAKER: I still have to -

COURT: What?

SCHUMAKER: I still have to put it under the evidence of the RVO.

COURT: I agree. So it – I mean unless – I mean – yeah, she still has to present the evidence so you want to waive on the weapons under disability and have additional portions of the trial outside the presence of the jury?

BREHM: I'm sorry, what's your question, sir?

COURT: So do you anticipate you're going to waive the jury for only Count Four.

BREHM: Yes.

COURT: And then you want to have a portion of this trial held outside the presence of the jury?

BREHM: No, sir. I think you will hear that simultaneously with the evidence.

SCHUMAKER: I don't know that they're going to be elements that you would hear outside of the jury -

COURT: I don't know how -

SCHUMAKER: that the jury wouldn't hear. I mean if you don't want to seem -

COURT: I don't see how that - there's going to be cross-pollination if you will on evidence without question because of the nature of the other charges. Now, if you're waiving consideration and asking the Court to simply make that - take that Count - what you're asking to take that Count away from the jury, have them make the determination on One, Two, and Three, and the Court on Four?

BREHM: Certainly.

COURT: Is that what you're asking?

BREHM: Yeah. Yeah.

COURT: I've never had anybody do it that way before but I think you can waive the jury for purposes of the court making the - - I am going to question your client to make sure he understands and consents outside the presence of the jury.

BREHM: Yes, sir. I was trying to keep a portion of that off out of their ear but I'll talk to him more about it and see.

COURT: I'm still not sure how your - -

SCHUMAKER: Yeah. I still present the same evidence.

COURT: It's still going to be the same for those specs.

BREHM: Okay. I'll talk to him about it. Can I have five minutes and I'll talk to him for a bit? It's what we had discussed before and he wanted me to do that so - -

COURT: It just - - how long - - I can't imagine you guys don't have a super long opening, right. My intent is to - -

BREHM: My opening will be super quick.

COURT: Do you want to talk to him a minute before you open; is that what you're asking me?
BREHM: She's going to go through her opening and we can talk during this.

COURT: How about this.  You talk to him after we do the opening.

BREHM: We'll do it that way.

COURT: If we need to do anything on the record before I bring them back in afterwards -

BREHM: Okay, okay.  That works.  Thank you.

COURT: Okay.

BREHM:  Yeah, thank you.

{¶38} As appellee also points out, after the bench conference and before the parties gave opening statements, the trial court instructed the jury: "remember that Opening Statements are designed to explain to you what each attorney thinks the evidence will or will not show and what the case is going to be about.  The statements of counsel in and of themselves are not evidence, just a preview of what they think the evidence will be."  The parties then gave opening statements and appellee referenced the charges during opening statement:

> There is a specification of - - repeat violent offender specification finding that the offender, Brandon C. Stodgel, is a repeat violent offender as defined in Section 2921 - - or 2929.01 of the Ohio Revised Code, having previously been convicted of aggravated robbery, section 2911.01 of the Ohio Revised Code, a first degree felony offense of violence, in the Court of Common Pleas, Highland County, Ohio, on or about August 31st, 2006.

In addition, appellee referenced the repeat violent offender specification in Count 2, the firearm specification to Count 1, and the weapon under disability prior conviction from Highland County.

**{¶39}** After appellant's opening statement, the court held a bench conference and stated, "defense counsel has indicated to the Court that the defendant wishes to waive his right to a jury on counts one and two with regard to the two specifications, each of those containing a repeat violent offender specification and a firearm specification. Is it the firearm as well or do you wish to - -" Defense counsel then stated, "It would just be the RVOs." The court then stated, "Just the RVO, okay. So that I understand, you're waiving for the Repeat Violent Offender specification on Counts One and Two and also waiving his right to a jury trial on Count Four, the weapons under disability, and opting instead for the court to determine whether the state has proven the RVO specs and Count Four beyond a reasonable doubt; is that correct?" Counsel agreed. In addition, counsel stated, "We would stipulate to the convictions that would give rise to the RVO specification and also the weapon under disability charge in Count Four."

**{¶40}** Appellee contends (1) that trial counsel adopted a strategy to try these charges to the bench so the jury did not hear

any evidence or review any exhibits related to these charges, and (2) the trial court clearly explained to the jury that counsel's remarks are not evidence.  Thus, appellee argues that trial counsel employed a trial strategy to try those offenses to the bench to eliminate the requirement to prove the prior convictions, even though the timing of the decision to try the cases to the judge may not have been ideal.  Thus, after the brief mention of the charges in opening statement, appellee made no reference to the charges during appellee's case.

{¶41} In order to find that appellant's trial counsel performed ineffectively, appellant must establish prejudice.  In other words, appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland* at 694.  A "reasonable probability" is more than "some conceivable effect," but less than "more likely than not [the error] altered the outcome of the case." *Strickland* at 693.  A "reasonable probability" is a probability sufficient to undermine confidence in the result of the proceeding. *Strickland* at 690-691; *Williams v. Taylor*, 529 U.S. 362, 390-391 (2000).

{¶42} In *State v. Bradford*, 2020-Ohio-4563 (4th Dist.), we

recognized that generally "[t]he existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule." *Id*. at ¶ 30, citing *State v. Allen*, 29 Ohio St.3d 53, 55 (1987). However, "[w]hen a prior conviction is an element of the charged offense, it may be admitted into evidence for the purpose of proving that element." *Id.*, citing *State v. Halsell*, 2009-Ohio-4166, ¶ 13 (9th Dist.); *accord State v. Thomas,* 2024-Ohio-2281, ¶ 37 (4th Dist.).

**{¶43}** R.C. 2941.149 provides that "[t]he court shall determine the issue of whether an offender is a repeat violent offender." Thus, by statute, the trial court determines the repeat-violent-offender specification, not the jury. *See State v. Hunt*, 2013-Ohio-5326, ¶ 76 (10th Dist.)(defendant may waive a jury on a weapon under disability charge, but "by statute," the repeat violent offender specification "is to be determined by the court rather than the jury"). Appellant contends, however, that mentioning the repeat-violent-offender specifications to the jury caused him prejudice.

**{¶44}** In the case sub judice, our review of the record reveals that appellee adduced at trial overwhelming evidence to support the

charges. Circumstantial evidence through the testimony of LeMaster and Morris established that the home had been burglarized. LeMaster testified to the forced entry through the garage and viewed in appellant's vehicle items from inside the home. Morris observed appellant and Ratliff coming from the victim's home carrying bags. Morris testified that appellant rammed his vehicle, robbed him of his cell phone at gunpoint, shot at Morris as he drove away, and ran into the woods along with Ratliff. Officers also found appellant's vehicle in the front yard of the victim's home. In addition, appellant admitted to officers that he owned the firearm found in the Honda Element, and that the other occupants of the Element had "nothing to do with it." Appellant also informed Captain Addy immediately after his capture that he "hung himself," and that he "did it this time."

**{¶45}** Moreover, the jury could certainly question the credibility of appellant's testimony and his second version of events given to Captain Addy. *See State v. Purdin,* 2013-Ohio-22, ¶ 19 (4th Dist.). A jury, sitting as the trier of fact, may choose to believe all or part or none of the testimony of any witness who appears before it. *State v. Daniels,* 2011-Ohio-5603, ¶ 23 (4th Dist.) Thus, in the case sub judice, the jury could easily choose

ROSS, 23CA15

to believe that appellant fabricated his later statement to Addy and his trial testimony. Further, officers found a firearm and live ammunition in the car from which they apprehended appellant approximately 20 minutes after the incident. Therefore, the jury could also choose to disregard appellant's contention that the only evidence that appellant used a firearm is Morris's testimony.

**{¶46}** It is well settled that debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if a better strategy is available. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995); *State v. Lawrence,* 2019-Ohio-2788, ¶ 19 (12th Dist.). Here, trial counsel should have advised the trial court of his intentions prior to opening statement. Nevertheless, we agree with appellee that, even if trial counsel's failure to prevent any mention to the jury of the repeat-violent-offender specifications and the weapons-under-disability count constituted ineffective assistance, appellant failed to establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Spaulding*, 2016-Ohio-8126, ¶ 153, quoting *Strickland* at 694. Here, the record before us is replete with evidence that appellant committed the charged crimes. Thus,

ROSS, 23CA15

pursuant to *Spaulding*, even if the failure to prevent the mention of the repeat-violent-offender specifications and the weapons-under-disability charge to the jury arguably fell below effective representation, we do not believe appellant demonstrated prejudice. *State v. Jones*, 2018-Ohio-1130, ¶ 18 (1st Dist.).

{¶47} Therefore, we are unpersuaded that the result would have been different if the jury had not heard appellee's opening statement.

*Admission of Criminal History for Impeachment Purposes*

{¶48} Appellant also contends that he received ineffective assistance of counsel when counsel failed to prevent the admission of appellant's criminal history for impeachment purposes. Appellee, however, points out that counsel correctly acknowledged at trial that appellant's prior offenses would be admissible for impeachment purposes if appellant chose to testify.

{¶49} "When an accused testifies at trial, Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused was convicted of an offense punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

ROSS, 23CA15

*State v. Bryan*, 2004-Ohio-971, ¶ 132; *State v. Dickess*, 2008-Ohio-39, ¶ 38 (4th Dist.).  "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule.  The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand."  *State v. Allen*, 29 Ohio St.3d 53, 55 (1987).

{¶50} Consequently, a trial court must consider the prejudicial effect of prior offense impeachment evidence even when such evidence may be properly presented to the jury.  Evid.R. 609(A)(2).  Furthermore, the risk of unfair prejudice is greater when the prior conviction is for the same crime with which a defendant is presently charged.  The natural tendency of prior conviction evidence in this situation is to instill in the jurors' minds the idea that " 'if he did it before, he probably did it this time.' " *State v. Goney*, 87 Ohio App.3d 497, 502, (2nd Dist.1993), quoting *Gordon v. United States*, 383 F.2d 936, 940 (C.A.D.C.1967).  Therefore, " 'those convictions which are for the same crime should be admitted sparingly.' "  *Id.*

**{¶51}** Evid.R. 609, Impeachment by Evidence of Conviction of

Crime, provides:

For the purpose of attacking the credibility of a witness:

* * *

(2) Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(3) Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance.

**{¶52}** As appellee observes, the Notes to Evid.R. 609 provide

that the "high probative value of convictions [involving dishonesty

and false statements] in assessing credibility," pursuant to

Evid.R. 609(A)(3) are usually not excluded because of unfair

prejudice. However, many courts have concluded that "[c]ourts

routinely allow prior conviction evidence under Evid.R. 609(A)(2)

even if the prior conviction did not contain an element of

untruthfulness." *State v. Topping*, 2012-Ohio-5617 (4th Dist.),

citing *e.g., State v. Brown*, 2003-Ohio-5059, ¶ 27 (no abuse of

ROSS, 23CA15

discretion to allow evidence of prior drug convictions to impeach aggravated murder defendant's credibility); *State v. Benitez*, 2011-Ohio-5498, ¶ 66 (8th Dist.)(evidence regarding accused's prior felonious assault conviction); *State v. Sailor*, 2004-Ohio-5207, ¶ 39 (8th Dist.) (no abuse of discretion to permit evidence of accused's prior drug-related convictions in aggravated murder trial). Moreover, as we held in *Topping,* to require a prior conviction to be specifically probative of truthfulness would defeat the purpose of Evid.R. 609(A)(2) and render Evid.R. 609(A)(3)1 meaningless. *Topping* at ¶ 45.

**{¶53}** Furthermore, when a defendant testifies prior crimes that involve dishonesty and moral turpitude are generally not subject to weighing the probative value against possible prejudice. *State v. Lamp,* 2021-Ohio-2354, ¶ 62 (7th Dist.), citing Evid.R. 609(A)(3), excluding Evid.R. 403(B). For example, theft and receiving stolen property are crimes of dishonesty under Evid.R. 609(A)(3). *Lamp, supra,* citing *State v. Turner,* 2004-Ohio-1545, ¶ 88 (7th Dist.)(aggravated robbery and theft); *State v. Brown*, 85 Ohio App.3d 716, 726 (3d Dist. 1993) (aggravated burglary, grand theft, and receiving stolen property); *State v. Johnson*, 10 Ohio App.3d 14, 16 (10th Dist. 1983) (petty theft and attempted receiving

stolen property); *State v. Taliaferro*, 2 Ohio App.3d 405, 406-407, (5th Dist. 1981) (petty theft and attempted receiving stolen property). Burglary or breaking and entering also fall into the category of crimes of dishonesty. *Lamp, id,* citing *State v. Ewing*, 2006-Ohio-5523, ¶ 24 (10th Dist.) (burglary); *State v. Wright*, 1998 WL 355862 (7th Dist. June 24, 1998) (burglary); *State v. Tolliver*, 33 Ohio App.3d 110, 113, (5th Dist. 1986) (attempted breaking and entering).

**{¶54}** In the case at bar, we do not believe that trial counsel provided ineffective assistance when counsel failed to object to the admission of appellant's criminal history for impeachment purposes. As appellee points out, appellee only asked the permitted information regarding the offenses, such as "the name of the crime [and] the time and place of the conviction." *Topping* at ¶ 52, citing McCormick on Evidence (4th Ed.1992 Strong) 57, Section 42. Here, we believe that the trial court could have reasonably determined that appellant's prior convictions constituted relevant and probative evidence to impeach appellant's credibility and the probative value outweighed any prejudicial effect. Thus, we do not believe counsel provided deficient performance, nor do we find prejudice.

{¶55} Accordingly, we overrule appellant's first assignment of error.

II.

{¶56} In his second assignment of error, appellant asserts that the trial court erred when it sentenced him to serve consecutive sentences. Appellant argues that the record does not clearly and convincingly support the sentence under R.C. 2929.14(C)(4) and R.C. 2953.08.

{¶57} Because the repeat-violent-offender specifications and the firearm specifications must be consecutively imposed by operation of law, appellant does not contest them. However, appellant challenges the discretionary consecutive imposition of the second aggravated robbery sentence that increased his total prison sentence from 29-34 ½ years to 40-45 ½ years.

{¶58} R.C. 2953.08 governs appeals based on felony sentencing guidelines. R.C. 2953.08(G)(2) states:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court

abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

**{¶59}** "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶60}** Although appellant concedes that "there are plenty of aggravating considerations supporting enhancements via consecutive impositions, appellant contends that placing appellant's presumptive release date at age 76 rather than 65 is neither (1) necessary to adequately protect the public, punish appellant, and rehabilitate him, nor (2) the minimum sanction required to do so, citing *State v. Saxon*, 2006-Ohio-1245, paragraphs one, two, and three of the syllabus; *State v. Gwynne I*, 2019-Ohio-4761, ¶ 17;

ROSS, 23CA15

*State v. Gwynne II,* 2022-Ohio-4607, ¶ 1-2, 31, *see also* R.C.

2929.11. Appellant further argues that "[t]his is particularly

true given the five-and-a-half year administrative enhancement

available at the Ohio Department of Rehabilitation and Correction

(DRC). If Mr. Stodgel at age sixty-five somehow remains a threat,

DRC can hold him for another five-and-a-half years."

**{¶61}** Appellee, however, points out that appellant does not

contend that the trial court failed to consider the R.C. 2929.11

factors, but rather argues that the sentence is excessive.

R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for
convictions of multiple offenses, the court may require
the offender to serve the prison terms consecutively if
the court finds that the consecutive service is necessary
to protect the public from future crime or to punish the
offender and that consecutive sentences are not
disproportionate to the seriousness of the offender's
conduct and to the danger the offender poses to the public,
and if the court also finds any of the following:
(a) The offender committed one or more of the multiple
offenses while the offender was awaiting trial or
sentencing, was under a sanction imposed pursuant to
section 2929.16, 2929.17, or 2929.18 of the Revised Code,
or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed
as part of one or more courses of conduct, and the harm
caused by two or more of the multiple offenses so committed
was so great or unusual that no single prison term for any
of the offenses committed as part of any of the courses of
conduct adequately reflects the seriousness of the
offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶62}** "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. However, the court "has no obligation to state reasons to support its findings" and has no obligation "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.; State v. Nolan,* 2024-Ohio-1245, ¶ 18 (4th Dist.). "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29. "If the trial court fails to make the requisite findings at the sentencing hearing, the imposition of consecutive sentences is contrary to law even if the sentencing entry includes the findings." *State v. Conn*, 2023-Ohio-2669, ¶ 26

ROSS, 23CA15

(4th Dist.), citing *State v. Brickles*, 2021-Ohio-178, ¶ 9, 11 (4th Dist.).

{¶63} In the case sub judice, our review of the sentencing transcript reveals that the trial court made the appropriate R.C. 2929.11 and 2929.12 findings. As we recently held in *Nolan, supra,* R.C. 2953.08(G)(2) does not permit an appellate court to simply conduct an independent review of a trial court's sentencing findings under R.C. 2929.12 or its adherence to the purposes of felony sentencing under R.C. 2929.11. *Nolan* at ¶ 44, citing *State v. Bryant,* 2022-Ohio-1878, ¶ 21, citing *State v. Jones*, 2020-Ohio-6729, ¶ 41-42. Moreover, R.C. 2953.08(G)(2) does not allow an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12. *Bryant* at ¶ 22, citing *Jones* at ¶ 31, 39.

{¶64} In the case sub judice, the sentencing hearing transcript reveals that since age 20, (1) appellant has committed numerous felony offenses, including violent offenses, (2) appellant pointed a gun at Morris's head when he took his cell phone after Morris intervened during the robbery, (3) appellant served a postrelease control term at the time of this offense, (4) appellant received

ROSS, 23CA15

additional charges for assaulting a law enforcement officer during the pendency of this case, and (5) appellant took no responsibility for his actions.  Thus, in light of the foregoing, we do not clearly and convincingly find that appellant's sentence is contrary to law.

**{¶65}** We also note that in his reply brief, appellant requests this court to hold this decision until the Supreme Court of Ohio's decision in *State v. Glover*, 2023-Ohio-1153 (1st Dist.), appeal allowed by *State v. Glover*, 2023-Ohio-2664.  *Glover* is pending at the Supreme Court of Ohio after oral arguments on February 7, 2024 and raises the following propositions of law: (1) Neither the trial nor the appellate courts are required by R.C. 2929.14(C)(4) to focus on a defendant's aggregate prison term when imposing or reviewing consecutive sentences, and (2) the clear and convincing standard of review outlined in R.C. 2953.08(G)(2) does not allow the court of appeals to substitute its judgment for that of the trial court.  As an intermediate appellate court, we are obligated to follow the Ohio Supreme Court's controlling authority.  Although we see no reason to hold this decision for the Supreme Court of Ohio's pending decision, we recognize and encourage appellant to consider an appeal of the instant case to the Ohio Supreme Court to

ROSS, 23CA15

preserve the consecutive sentence issue until *Glover* is resolved.

**{¶66}** In the case sub judice, we point out that the sentence the trial court imposed is within the statutory range. Further, our review is limited, under R.C. 2953.08(G)(2)(a), to whether the record clearly and convincingly does not support the trial court's findings under R.C. 2929.14(C)(4).

**{¶67}** Accordingly, for all of the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                                Peter B. Abele, Judge


NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.